**Lawrence E. LINK, Petitioner,**

v.

**DEPARTMENT OF the TREASURY, Respondent.**

No. 93–3354.

United States Court of Appeals, Federal Circuit.

March 31, 1995.

Joyce F. Glucksman, Atlanta, GA, argued, for petitioner.

Donna C. Maizel, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued, for respondent. With her on the brief were Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director and Bryant G. Snee, Asst. Director.

Before PLAGER, CLEVENGER, and SCHALL, Circuit Judges.

Opinion for the court filed by Circuit Judge SCHALL.

Concurring opinion filed by Circuit Judge PLAGER.

SCHALL, Circuit Judge.

Lawrence E. Link petitions for review of the final decision of the Merit Systems Protection Board (Board) in *Link v. Department of the Treasury,* Docket Nos. AT–0432–92–0645–I–1 and AT531D920646–I–1. The March 10, 1993 initial decision of the administrative judge (AJ) became the final decision of the Board on April 14, 1993, when Link failed to file a petition for review. In its decision, the Board dismissed Link's appeal of his removal from the United States Customs Service (Customs or agency)[1] for lack of jurisdiction, because it found that Link had waived his appeal rights in a "last-chance" settlement agreement. Link sought to prevent enforcement of the waiver by attempting to establish that Customs had breached the last-chance agreement. Although the Board concluded that Customs had failed to comply with some of the requirements of the agreement, it held that Link had failed to establish breach because he had not proved that the agency had acted in bad faith. Because we hold that the Board erred as a matter of law in requiring Link to prove bad faith on the part of Customs and because we hold that Customs

---

1. Customs is a division of the Department of the Treasury (Treasury), the respondent in this appeal.

breached the last-chance agreement, we reverse and remand and instruct the Board to reinstate Link's appeal.

## BACKGROUND

### I

Link was employed as an auditor by Customs in its Southeast Region in Charlotte, North Carolina. In November of 1990, the agency removed him for unacceptable performance, pursuant to 5 U.S.C. § 4303. After Link appealed the removal to the Board, he and the agency settled the case by entering into a last-chance agreement.

The last-chance agreement provided that Link be reinstated to his position as an auditor and then be evaluated over an eight-month period. During this evaluation period, Link first would undergo two months of training and then would be given six months during which to demonstrate acceptable job performance. If, at the end of the eight-month evaluation period, Link's performance was deemed acceptable, he would be returned to his position on a permanent basis. If, on the other hand, his performance was deemed unacceptable, the removal would be reinstated and he would be permanently separated from the agency.

Five provisions of the last-chance agreement are relevant to this appeal. In Article 4, Customs agreed that it would not scrutinize Link's performance any more or any less strictly than that of any other employee. Article 6 of the agreement provided that, if at the end of the eight-month evaluation period Link's performance was deemed unacceptable by his supervisors, his work would be reviewed "by the Regional Director of another region outside the Southeast Region." Article 6 further provided that "[a]ny memorandums concerning Mr. Link's performance written by Agency employees or Mr. Link will ... be provided to the reviewing Regional Director." Article 7 of the agreement provided that if the reviewing Regional Director agreed that Link's work was unacceptable, the removal action would be reinstated and Link would be removed for unacceptable performance. However, Article 9 provided that if the reviewing Regional Di-

rector did not agree that Link's work was unacceptable, Link would be allowed to keep his job. Finally, in Article 8 of the agreement, Link agreed that if he was removed for unacceptable performance, he would waive his right to appeal to the Board.

### II

Link returned to work under the last-chance agreement in June of 1991. In due course, after successfully completing two months of training, he was assigned to perform a customs audit of certain "Pic N Pay" stores. In early October, after he had begun work on the Pic N Pay audit, Link was visited by a co-worker who examined his work papers and determined that the audit was progressing satisfactorily. Thereafter, co-workers visited Link on a monthly basis to discuss the audit with him.

On January 15, 1992, John Jasman, Link's immediate supervisor, directed Link to submit all of his audit work papers on January 24 for a performance review, as required by the last-chance agreement. Upon receiving the work papers, Mr. Jasman instructed Chad Nesbit and Larry Goodman, two of Link's co-workers, to conduct a peer review of the Pic N Pay audit. After reviewing the work papers from the audit, Messrs. Nesbit and Goodman concluded that Link's work was unacceptable because he had failed to substantiate a number of his conclusions and findings.

In reviewing the work papers, Mr. Nesbit and Mr. Goodman used audit review sheets. Each of these sheets contained four columns. The first column identified by number the work paper being reviewed; the second column was for the reviewer's comments concerning the work paper; the third column was for Link's responses to those comments; and the fourth column was for the reviewer's clearance. If a reviewer made an entry in the fourth column, it meant that, for the indicated work paper, Link's response in column 3 satisfactorily responded to the reviewer's comment in column 2. It appears that Link prepared his column 3 responses to Mr. Nesbit's and Mr. Goodman's comments after the audit work papers and audit review

sheets were forwarded to Link's supervisors for review.

After Mr. Nesbit and Mr. Goodman had completed their peer review, Link's audit work papers and the audit review sheets were reviewed by Mr. Jasman and by Patricia Goldman, the Southeast Region's Regional Director for Regulatory Audits. Mr. Jasman and Ms. Goldman agreed with Mr. Nesbit and Mr. Goodman that Link's work on the audit was unsatisfactory.[2]

On February 4, Mr. Jasman notified Link in writing that his performance had been found to be unsatisfactory because, in five instances over the previous six months, he had failed "to obtain sufficient, competent, and relevant evidence to support judgments, conclusions, recommendations, or elements of audit findings." In so doing, Mr. Jasman wrote, Link had failed to meet one of the performance standards under which he had been evaluated. This standard allowed no more than four such failures over a six-month period. Link responded to Mr. Jasman's notice of deficiencies on February 14. In his response, Link argued that Customs had violated Article 4 of the last-chance agreement because it had reviewed his work more rigorously than that of other employees.

On March 27, Mr. Nesbit cleared 30 of the approximately 70 comments which had been made in the course of the January review of Link's work papers. Shortly thereafter, on April 2, in accordance with Article 6 of the last-chance agreement, Ms. Goldman sent a memorandum to H. Tim Whitworth, her counterpart in the agency's South Central Region. In her memorandum, Ms. Goldman asked Mr. Whitworth to review Link's "work papers and work" against the applicable performance standards and to then determine whether Link's work was unacceptable. Ms. Goldman wrote that she was sending Mr. Whitworth "the notice of deficiencies issued to Mr. Link by ... Mr. Jasman, as well as the work paper review notes upon which the notice of deficiencies was based and other memorandums related to ... performance of the audit." Ms. Goldman also wrote that she was enclosing a copy of Link's response to

the notice of deficiencies, as well as two letters from Link's attorney to Mr. Jasman. The "work paper review notes" to which Ms. Goldman referred were the comments of Messrs. Nesbit and Goodman on the four-column audit review sheets discussed above. However, the 17 pages of audit review sheets which were sent to Mr. Whitworth did not contain either Link's responses to the reviewers' comments or Mr. Nesbit's notations reflecting the 30 clearances. Nor was Mr. Whitworth provided with certain memoranda regarding Link's two months of training and the monthly visits of his co-workers during the time that he was conducting the Pic N Pay audit.

After reviewing the material which Ms. Goldman had sent to him, Mr. Whitworth also concluded that Link's work on the Pic N Pay audit was unacceptable because Link had failed to sufficiently document and support his findings and conclusions. Mr. Whitworth reported his conclusions back to Ms. Goldman in a memorandum dated April 10. On April 14, Customs informed Link that, in accordance with the last-chance agreement, it was reinstating his November 1990 removal.

### III

After Link appealed his reinstated removal to the Board, Treasury moved to dismiss, arguing that the Board lacked jurisdiction because Link had waived his appeal rights in the last-chance agreement. Link responded that Customs was not entitled to have the waiver enforced.

As noted above, on March 10, 1993, the AJ dismissed Link's appeal for lack of jurisdiction. The AJ started from the premise that, in order to establish jurisdiction, Link had to prove 1) that he had complied with the last-chance agreement, 2) that Customs had breached the agreement by acting in bad faith or arbitrarily and capriciously, or 3) that he had not entered into the agreement knowingly and voluntarily. Link contended that he had complied with the agreement because he had performed satisfactorily and that, in any event, Customs had breached the agreement. As far as breach was concerned, Link claimed that Customs had violated Arti-

2. It is unclear from the record whether Link ever completed the Pic N Pay audit.

cle 4 by reviewing his work more rigorously than that of other employees. Link also claimed that Customs had failed to comply with Article 6 because the Southeast Region had not provided Mr. Whitworth with either the audit review sheets showing Link's comments and the clearances by Mr. Nesbit, or the memoranda concerning his training and the visits of his co-workers to the audit site.

After a hearing, the AJ concluded that Link had failed to prove that he had complied with the last-chance agreement because, in the five instances identified in the notice of deficiencies, he had failed to provide sufficient evidence to support his audit conclusions. The AJ also rejected Link's breach claims. As far as the alleged violation of Article 4 was concerned, the AJ found no evidence that Customs had reviewed Link's work more rigorously than that of other employees. Next, the AJ considered Link's claim that Customs had failed to comply with Article 6. While recognizing that the Southeast Region had failed to provide Mr. Whitworth with the fully-completed audit review sheets, the AJ found no bad faith on the part of Customs. The AJ stated that "there is nothing to suggest that the agency's failure to subsequently marry up the appellant's comments with the packet of information forwarded to Mr. Whitworth was anything more than an oversight." Addressing Link's contention with respect to the memoranda regarding his training and the visits of his co-workers to the audit site, the AJ stated that it was "questionable whether these documents [were] even relevant to the question of whether the appellant's performance during the six-month period was satisfactory." The AJ added that, in his view, the documents hurt Link's case because they showed that he received adequate training and was assisted in the audit. The AJ thus concluded that Link had failed to show by preponderant evidence either that he had complied with the last-chance agreement or that Customs had breached the agreement.

## DISCUSSION

### I

■ We affirm a decision of the Board unless we find it to be "(1) arbitrary, capri-

cious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c) (1988); *Cheeseman v. Office of Personnel Management,* 791 F.2d 138, 140 (Fed. Cir.1986), *cert. denied,* 479 U.S. 1037, 107 S.Ct. 891, 93 L.Ed.2d 844 (1987). On appeal, Link bears the burden of establishing error in the Board's decision. *Cheeseman,* 791 F.2d at 140.

■ Before the Board, Link had the burden of establishing jurisdiction by a preponderance of the evidence. 5 C.F.R. § 1201.56(a)(2) (1994); *Clark v. United States Postal Serv.,* 989 F.2d 1164, 1167 (Fed. Cir.1993); *Burgess v. Merit Sys. Protection Bd.,* 758 F.2d 641, 642–43 (Fed.Cir.1985). The Board has taken the position that it lacks jurisdiction over adverse actions where, as here, an individual has waived his or her appeal rights in a last-chance agreement. *See, e.g., McCall v. United States Postal Serv.,* 839 F.2d 664, 668–69 (Fed.Cir.1988). However, a waiver of appeal rights will not be enforced if an agency breaches a last-chance agreement. *Id.* at 667.

### II

On appeal, Link makes two arguments. First, he contends that the AJ erred as a matter of law in holding that, in order to establish breach on the part of Customs, he had to show that the agency acted in bad faith or arbitrarily and capriciously. According to Link, it was enough for him to show that Customs breached the agreement by not affording him the procedural protections for which he had bargained. Second, Link argues that, under the standard which should have been applied by the AJ, he established that the agency breached Articles 4 and 6 of the last-chance agreement and that therefore the agency was not entitled to have the waiver of appeal rights enforced against him.[3] Treasury disagrees. It contends that, as far

---

**3.** On appeal, Link does not pursue the argument

that he proved his compliance with the last-

as a claim of breach is concerned, the exclusive grounds for not enforcing a waiver of appeal rights in a settlement agreement are bad faith or arbitrary and capricious conduct by the agency. Treasury also contends that the finding of the AJ that Customs did not act in bad faith is supported by substantial evidence. Accordingly, argues Treasury, we should affirm the decision of the Board dismissing Link's appeal for lack of jurisdiction. We conclude that Link is correct.

## III

The AJ correctly stated that Link could overcome his waiver of appeal rights by proving that he complied with the last-chance agreement, that Customs breached the agreement, or that he did not knowingly and voluntarily enter into the agreement. From that point, however, the AJ erred by taking too narrow a view of what constitutes breach of a last-chance agreement. A last-chance agreement is a settlement agreement, and a settlement agreement is a contract. *Greco v. Department of the Army*, 852 F.2d 558, 560 (Fed.Cir.1988). Because it is an implied term of every contract that each party will act in good faith towards the other, a party may breach a contract by acting in bad faith. *See Solar Turbines, Inc. v. United States*, 23 Cl.Ct. 142, 155–56 (1991). A party is not limited to proving breach in that manner, however. It may establish breach by proving that the other party failed to comply with a provision of the contract in a way that was material, regardless of the party's motive. *See e.g., Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1551–53 (Fed.Cir. 1992). Thus, the AJ erred in starting from the premise that, in order for Link to establish that Customs had breached the last-chance agreement, he had to prove that it had acted in bad faith. Link also was entitled to establish breach by showing that the agency failed to comply in a material way with the provisions of the agreement.

The AJ cited a statement in *McCall* for the proposition that Link had to prove that Customs acted in bad faith or arbitrarily and capriciously. In *McCall*, a Postal Service employee sought to overcome the appeal

rights waiver in his last-chance agreement by arguing that a certain provision in the agreement impermissibly opened the door to "subjective evaluation by the agency" and that therefore the agreement was invalid. *McCall*, 839 F.2d at 667. The *McCall* court rejected the contention. In so doing, it made the statement upon which the AJ relied in this case:

> We agree that the term [at issue] does introduce an element of subjectivity into the agreement, but this does not mean that agencies would have a free hand to take arbitrary action against employees. We think it is implicit in the agreement here that the agency must abide by it in good faith. Thus, the agreement itself serves as a check on arbitrary agency action. If an agency acts in bad faith or takes other arbitrary and capricious action, as a breaching party it would not be able to enforce the agreement.

*Id.* Thus, in addressing McCall's contention that his last-chance agreement was invalid, the court simply relied upon the well-established principle that it is an implied term of every contract that the parties will deal in good faith with each other. In short, there is nothing in *McCall* which can be read as a holding that, in order to establish breach of a last-chance settlement agreement, a party must prove that the agency acted in bad faith or arbitrarily and capriciously. This is not surprising, for such a holding would be contrary to settled principles of contract law.

## IV

Link contends that, under the correct standard, he established before the Board that Customs breached the last-chance agreement by failing to comply with Articles 4 and 6. Link's claim with respect to Article 4 need not detain us, for we have no difficulty concluding that the AJ's finding that Customs did not review Link's work any more rigorously than that of other employees is supported by substantial evidence. Accordingly, the factual predicate for Link's claim that there was a breach of Article 4 is lacking. We thus turn to the issue of whether Cus-

chance agreement.

toms breached the last-chance agreement by failing to comply with Article 6.

▮▮▮ The question of whether non-compliance with the provisions of a contract is material, so as to result in breach of the contract, depends on "the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." *Stone Forest Indus., Inc.*, 973 F.2d at 1550–51. For the following reasons, we hold that the failure of the Southeast Region to provide Mr. Whitworth with the fully-completed audit review sheets and the memoranda relating to Link's training and the visits of co-workers to the audit site was material non-compliance with Article 6 of the last-chance agreement. Therefore it constituted breach of the agreement.

We start from the premise that the requirements of Article 6 were material provisions of the last-chance agreement. Under Article 6, if at the end of the eight-month evaluation period Link's performance was deemed unacceptable by his supervisors in the Southeast Region, his work would be reviewed by a Regional Director from another region. Under Article 9 of the agreement, if the reviewing Regional Director disagreed with the evaluation of the Southeast Region, Link would be allowed to keep his job. In short, review by the "outside" Regional Director was a crucial part of the agreement because it provided Link with the additional procedural safeguard of an evaluation of his work by someone who was not from the Southeast Region. This outside evaluation was important in view of the element of subjectivity inherent in the evaluation process. It also was important in view of the fact that the performance standard requirement that there be no more than four instances of failure to support audit conclusions during the six-month period left Link little margin for error.

Turning to the facts, we do not quarrel with the AJ's characterizing as an "oversight" the agency's failure to provide Mr.

Whitworth with the fully-completed audit review sheets. As discussed above, however, whether the agency acted in good faith is not the issue. What is important is that the agency's oversight had significant consequences. When reviewing Link's work, Mr. Whitworth did not have before him Link's line-by-line responses to the reviewers' comments on the audit review sheets. In addition, he did not have before him the fact that Mr. Nesbit had cleared 30 of the approximately 70 comments that he and Mr. Goodman had made. Although Mr. Whitworth was provided with Link's response to the notice of deficiencies and with his attorney's letters to Mr. Jasman, these documents could not convey fully the substance of Link's individual responses to each of the reviewers' comments. Accordingly, Link was deprived of the opportunity to dispel, in the eyes of Mr. Whitworth, the unfavorable impression created by the 17–page list of critical comments regarding his work.

The other documents which Mr. Whitworth did not have before him were the memoranda regarding Link's two months of training and the monthly visits of his co-workers while he was conducting the Pic N Pay audit. It certainly is possible that Mr. Whitworth would have viewed these documents the same way the AJ did—as being irrelevant and unhelpful to Link. Our review, however, convinces us that Mr. Whitworth would not necessarily have done so. In view of the non-critical tenor of these documents and the fact that they indicate Link was cooperative and apparently working diligently on the audit, it also is possible that Mr. Whitworth would have viewed these documents as favorable to Link.

In sum, Link was deprived of the full benefit of Mr. Whitworth's review, for which he had bargained, because Mr. Whitworth was not provided with all the documents relating to Link's performance, as required by Article 6 of the last-chance agreement. For this reason, we hold that Customs breached the last-chance agreement.[4]

4. The government contends that Link breached the last-chance agreement because his work was ultimately found by Customs to be unacceptable. This argument must be rejected. Although Customs determined that Link's work was unacceptable, it did so after a review which failed to comply with a critical provision of the last-chance agreement.

## CONCLUSION

Because Customs breached the last-chance agreement, Treasury is not entitled to have the waiver of appeal rights in the agreement enforced against Link. Accordingly, the decision of the Board dismissing Link's appeal of the reinstated 1990 removal action for lack of jurisdiction is reversed. The case is remanded to the Board, which is instructed to reinstate the appeal.

*REVERSED AND REMANDED WITH INSTRUCTIONS.*

PLAGER, Circuit Judge, concurring.

I am in full agreement with the opinion of the court, and the result reached.

Link properly invoked the jurisdiction of the Board under the MSPB's statutory power to review an adverse action—in this case dismissal for unacceptable performance—taken by an agency against an employee. Just as the parties to a dispute cannot by agreement grant a court or statutory board subject-matter jurisdiction over the dispute when it is otherwise lacking, neither can they by agreement take it away when it exists. The last chance agreement did not affect the Board's jurisdiction; in that respect, the AJ erred when he dismissed Link's appeal purportedly for lack of jurisdiction.

A last chance agreement is a contract under which an employee waives his statutory right of appeal; this court has held such agreements not to be against public policy. *McCall v. United States Postal Serv.,* 839 F.2d 664 (Fed.Cir.1988). An employee who attempts to appeal to the Board in the face of a valid and enforceable last chance agreement fails to state a claim upon which relief can be granted, because the employee has waived his right to that relief. This has nothing to do with the subject-matter jurisdiction of the MSPB or of this court. Statements by the government and the Board or its AJs to the effect that last chance agreements go to the jurisdiction of the Board are misleading and legally incorrect. If lawyers for the parties as well as the administrative judges would adhere to correct terminology, the legal analysis would benefit.