**Randall W. GILBERT, Petitioner,**

v.

**DEPARTMENT OF JUSTICE,
Respondent.**

No. 02–3278.

United States Court of Appeals,
Federal Circuit.

July 2, 2003.

Thomas G. Roth, of West Orange, NJ, argued for petitioner.

David R. Feniger, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; and Brian M. Simkin, Assistant Director.

Before NEWMAN, SCHALL, and DYK, Circuit Judges.

SCHALL, Circuit Judge.

Randall W. Gilbert was formerly employed as a Criminal Investigator with the Department of Justice's ("agency's") Drug Enforcement Administration ("DEA"). On July 29, 1999, the agency proposed his removal for misconduct. Subsequently, Mr. Gilbert and the agency entered into a "Negotiated Last–Chance Agreement." In the agreement, the agency agreed to hold the proposed removal in abeyance as long as Mr. Gilbert complied with the terms of the agreement. For his part, Mr. Gilbert agreed that he would be removed upon the occurrence of any one of five specified events, each of which was designated as a breach of the agreement on his part. In addition, he waived his right to appeal any removal action that resulted from his breach of the agreement.

On April 25, 2001, the agency removed Mr. Gilbert for failure to comply with the terms of the last-chance agreement. Mr. Gilbert timely appealed his removal to the Merit Systems Protection Board ("MSPB" or "Board"). Following a hearing, the administrative judge ("AJ") to whom the appeal was assigned found that Mr. Gilbert had breached the last-chance agreement. Since Mr. Gilbert had waived his right to appeal any removal action resulting from his breach of the agreement, the AJ, in an initial decision dated August 28, 2001, dismissed the appeal for lack of jurisdiction. *Gilbert v. Dep't of Justice*, No.

CH0752010436–I–1 (M.S.P.B. Aug.28, 2001) ("*Initial Decision*"). The AJ's initial decision became the final decision of the Board on April 30, 2002, when the Board denied Mr. Gilbert's petition for review. *Gilbert v. Dep't of Justice*, No. CH0752010436–I–1 (M.S.P.B. Apr.30, 2002) ("*Final Decision*").

Mr. Gilbert now petitions for review of the Board's *Final Decision*. While we agree with the Board that Mr. Gilbert was in non-compliance with the last-chance agreement, we conclude that his non-compliance was not material and therefore did not trigger the provision of the agreement that gave the agency the right to remove Mr. Gilbert and under which he waived his right to appeal to the Board. Accordingly, the decision of the Board is reversed. The case is remanded to the Board with the instruction that the Board direct the agency to reinstate Mr. Gilbert to his position.

## BACKGROUND

### I.

The pertinent facts are not in dispute. On July 29, 1999, the agency informed Mr. Gilbert, who was then employed as a Criminal Investigator with DEA's Detroit Field Office, that it proposed to suspend him for 60 days. The proposed action was based on two charges: "unauthorized use of an official government vehicle (OGV)" and "poor judgment." The agency alleged that on February 5, 1999, Mr. Gilbert drove his OGV in Versailles, Kentucky, while under the influence of alcohol, as evidenced by his arrest and subsequent conviction on March 29, 1999 for that offense. The agency also alleged that Mr. Gilbert attempted to use his government position for private gain when he asked the arresting officers to drive him home or allow him to call someone to pick him up.

Subsequently, on September 15, 2000, Mr. Gilbert and the agency entered into the last-chance agreement. In the last-chance agreement, which was to remain in effect for the remainder of Mr. Gilbert's employment with DEA, the parties agreed that the charges contained in the notice of proposed suspension were supported by the evidence and that the notice of proposed suspension would be converted into a notice of proposed removal. However, the agreement provided that the penalty of removal would be "held in abeyance and not be effected." In return, Mr. Gilbert accepted a 60–day suspension and agreed that, prior to returning to duty, he would be medically cleared by DEA.

The last-chance agreement imposed various additional obligations upon Mr. Gilbert. In relevant part, it specified, in paragraph II.(d), that he would continue his participation in, and that he would successfully complete, an alcohol rehabilitation, treatment, and counseling program, and that he would participate in any after-care/monitoring program required after completion of the rehabilitation program. In paragraph II.(e) of the agreement, Mr. Gilbert stated that he would remain alcohol-free for the remainder of his career with DEA and that he would continue any after-care/monitoring program that was required for his rehabilitation. Under paragraph II.(f) of the agreement, Mr. Gilbert was required to provide quarterly reports on or before April 1st, July 1st, October 1st, and January 1st of each year to DEA's Deputy Assistant Administrator for Personnel and Chief Medical Officer. The purpose of these reports was to enable DEA to determine whether Mr. Gilbert was complying with the agreement. In paragraph II.(g) of the agreement, Mr. Gilbert stated that he would notify the Deputy Assistant Administrator for Personnel and Chief Medical Officer "upon either his completion of, or failure to com-

plete, any required after-care counseling and/or monitoring program."

Paragraph II. (*l*) of the agreement stated that if any one of five specified events occurred, Mr. Gilbert would be removed from his position. It provided as follows:

l. SA Gilbert agrees that upon the occurrence of:

1. any alcohol related incident or misconduct (either on-duty or off-duty), or

2. any serious violation of DEA Standards of Conduct (defined to be any misconduct sustained by a Deciding Official for which a penalty of a 15–day suspension or more, to include demotions and removals[,] is imposed), or

3. SA Gilbert's failure to participate [in] and complete the programs identified in paragraph d above and any associated after-care requirements, or

4. SA Gilbert's failure to immediately notify DEA of SA Gilbert's failure to complete the programs identified in paragraph d above, and any associated after-care requirements, or

5. SA Gilbert's testing positive for alcohol as a result of an appropriate test,

SA Gilbert will be removed from his position as a DEA Special Agent and from the Federal government.

Finally, in paragraph II.(n) of the last chance agreement, Mr. Gilbert agreed that if he violated the agreement and the agency removed him for the violation, he would forfeit "any and all rights to grieve, appeal, or otherwise challenge the removal action in any forum, administrative or judicial."

## II.

Following his February 5, 1999 arrest, and while he was suspended from work, Mr. Gilbert entered a 28–day in-patient rehabilitation program at the Marworth Rehabilitation Center in Waverly, Pennsylvania. After his release from Marworth, Mr. Gilbert participated in a 13–week program of group therapy sessions at Clark and Clark, an alcohol and substance abuse counseling facility in Lexington, Kentucky. In addition, he began seeing Dr. William Meegan, a clinical psychologist. During 1999 and 2000, Dr. Meegan provided Mr. Gilbert with therapy and treated him for his alcohol dependence. During this same period, Mr. Gilbert joined Alcoholics Anonymous ("AA") and became a member of the Token Club, a social organization for alcoholics in the Lexington area.

After the last-chance agreement was executed, Mr. Gilbert was given a fitness-for-duty examination by DEA. Thereafter, on December 1, 2000, he received a letter from Retha M. Fulmore, a Deputy Assistant Commissioner with DEA's Office of Personnel, informing him that he had been found fit for duty and that he would be returned to full duty status on December 14, 2000. In her letter, Ms. Fulmore reminded Mr. Gilbert of his obligation to provide DEA with quarterly reports demonstrating his compliance with the last-chance agreement.

On December 20, 2000, Mr. Gilbert submitted his first quarterly report to DEA. In the report, he stated that he was seeing Dr. Meegan on a bi-weekly basis. Ms. Fulmore replied in a letter dated February 14, 2001. After thanking Mr. Gilbert for his report, she asked him to have Dr. Meegan submit a report to DEA relating to Mr. Gilbert's alcohol rehabilitation and after-care/monitoring program by March 2nd.

Mr. Gilbert's next quarterly report under the last-chance agreement was due on or before April 1, 2001. That date came and went, however, without any report being submitted and without Ms. Fulmore having received the report that she had requested from Dr. Meegan. On April 9th, Mr. Gilbert sent Ms. Fulmore a memorandum, which she received on April 16th. After referring to her February 14th letter, he wrote, "This memo constitutes the third quarterly report in compliance with my last-chance agreement." At the same time, he apologized for his lateness in submitting the report, stating, "I have no excuse, excepting that the end of the last quarter was very busy for me." In the letter, Mr. Gilbert informed Ms. Fulmore that he was maintaining his membership in AA and that he continued to be an active member of the Token Club. As far as his therapy was concerned, Mr. Gilbert stated: "I have run into a slight snag concerning my continuing psychotherapy. Blue Cross/Blue Shield has changed their mental health program to something called Magellan. Dr. Megan [sic] ... has decided not to participate in the Magellan provider program. I am forced to change to another psychologist who is participating in the program, which I am pursuing as we speak."

Nine days later, on April 18th, Dr. Meegan sent Dr. Pamela Adams of DEA's Health Services Unit a memorandum summarizing a conversation he had with her that day concerning Mr. Gilbert. Dr. Meegan stated he was able to confirm that Mr. Gilbert "was a compliant patient who participated in therapy willingly and cooperatively." He also stated that Mr. Gilbert had "fifteen office visits during the year 2000 and many office visits in the prior year following his referral from Marworth in March of 1999 with a diagnosis of Alcohol Dependence." Dr. Meegan concluded his memorandum by stating that he was "unaware of any recurring problems with alcohol" and that he was "unaware of any recurring problems with noncompliance."

On April 23, 2001, Sharon Crawford of DEA called Dr. Meegan concerning Mr. Gilbert. Dr. Meegan provided Ms. Crawford with the same information that he had given to Dr. Adams. Dr. Meegan stated that, at his last meeting with Mr. Gilbert on December 6, 2000, he and Mr. Gilbert had discussed future appointments. He also stated that, at that time, based on the progress Mr. Gilbert had made, he decided that continued treatment was no longer indicated at the level that had been necessary in the previous months. Dr. Meegan added that, as of December 6th, he anticipated that, during the period of the next four to six months, Mr. Gilbert would have one to three visits of a follow-up nature. Dr. Meegan noted that he had recommended that Mr. Gilbert call him after the Christmas holidays to schedule a visit and that Mr. Gilbert had in fact called. However, because Mr. Gilbert's medical insurance coverage had changed, he was no longer able to see Dr. Meegan.

On April 23, 2001, the Special Agent in Charge of the Detroit Field Office placed Mr. Gilbert on administrative leave. Mr. Gilbert was informed that he was being placed in that leave status "pending a final decision relative to what actions should be taken based upon your violation of the last-chance agreement that you entered into with this agency on September 15, 2000."

Two days later, on April 25th, James F. Getz, the Deciding Official for DEA's Human Resources Division, sent Mr. Gilbert a memorandum informing him that he was being removed from his position because of his non-compliance with the last-chance agreement. Mr. Getz pointed out that Mr. Gilbert had failed to comply with Ms. Ful-

more's request for a report from Dr. Meegan by March 2, 2001, and that he had not met the April 1st quarterly report deadline set forth in paragraph II.(f) of the last-chance agreement. Mr. Getz also pointed out that Dr. Meegan had stated in his April 18th memorandum to Dr. Adams that he had not seen Mr. Gilbert since his visit on December 6, 2000. Mr. Getz wrote that, in accordance with the provisions of subparagraphs 3 and 4 of paragraph II.(l) of the last-chance agreement, he was putting into effect the July 29, 2000 removal action that had been held in abeyance provided that Mr. Gilbert complied with the terms of the agreement. Mr. Gilbert timely appealed his removal to the Board.

### III.

■ Mr. Gilbert had the burden of establishing by a preponderance of the evidence that the Board had jurisdiction over his appeal. *See* 5 C.F.R. § 1201(a)(2)(i). Pursuant to 5 U.S.C. § 7701(a), a federal employee, such as Mr. Gilbert, may appeal to the Board "from any action which is appealable to the Board under any law, rule, or regulation." By regulation, removal actions may be appealed to the Board. *See id.* § 1201.3(a)(2). However, it is well-settled that a waiver of appeal rights divests the Board of jurisdiction over the appeal of an adverse action, such as a removal. *Link v. Dep't of Treas.*, 51 F.3d 1577, 1581 (Fed. Cir.1995); *McCall v. United States Postal Serv.*, 839 F.2d 664, 668–69 (Fed.Cir.1988); *Merriweather v. Dep't of Transp.*, 59 M.S.P.R. 434, 435–39 (1993). In the last-chance agreement, Mr. Gilbert agreed that if he breached the agreement, he would be removed, and he waived his right to appeal the removal. Thus, to establish Board jurisdiction, Mr. Gilbert had the burden of proving that he did not breach the agreement. *See Gibson v. Dep't of Veterans Affairs*, 160 F.3d 722, 726 (Fed.Cir.1998); *Link*, 51 F.3d at 1581.

Before the Board, Mr. Gilbert advanced two arguments. First, he urged that the last-chance agreement was invalid for lack of consideration. Second, he argued that he was not in material non-compliance with the agreement so as to trigger his removal and the waiver of appeal rights. Following a hearing, the AJ rejected both contentions. *Initial Decision* at 5, 7. After holding that the last-chance agreement was valid, he turned to the issue of whether Mr. Gilbert had breached the agreement. *Id.* at 5. The AJ noted that, in his testimony, Mr. Gilbert admitted that he had failed to timely submit the quarterly report due on April 1, 2001, and that he had not provided the information from Dr. Meegan that Ms. Fulmore had requested in her letter of February 14, 2001. *Id.* The AJ also noted that, by not returning to see Dr. Meegan after December 6, 2000, and by not scheduling appointments with another health-care provider, Mr. Gilbert had failed to complete all of his after-care requirements. *Id.* In addition, the AJ pointed out that Mr. Gilbert conceded that, after his last visit with Dr. Meegan, it was not until April of 2001 that he informed the agency that he had stopped seeing a health care provider. *Id.* After rejecting all of Mr. Gilbert's explanations for his failure to comply with the terms of the last-chance agreement, the AJ found that Mr. Gilbert had "breached at least four provisions of the last-chance settlement agreement and that breach of those provisions required, according to the agreement, he be removed without any right of appeal to the Board." *Id.* at 7. The AJ's initial decision became the final decision of the MSPB after the Board denied Mr. Gilbert's petition for review. *Final Decision* at 1. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9).

## ANALYSIS

### I.

Our scope of review in an appeal from a decision of the Board is limited. Specifically, we must affirm the Board's decision unless we find it to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; obtained without procedures required by law, rule or regulation having been followed; or unsupported by substantial evidence. 5 U.S.C. § 7703(c); *Kewley v. Dep't of Health & Human Servs.*, 153 F.3d 1357, 1361 (Fed. Cir.1998).

On appeal, Mr. Gilbert does not challenge the validity of the last-chance agreement. Rather, he argues that the Board erred in finding that he breached the agreement. He acknowledges that, because he was late in submitting his April 1, 2001 quarterly report, and because he failed to consult with another psychologist after leaving Dr. Meegan's care, he was in technical violation of the agreement. He asserts, however, that at the time of his removal, he had been sober for 27 months and that, according to Dr. Meegan, he had recovered from his alcoholism. Under these circumstances, Mr. Gilbert contends, he was in substantial compliance with the last-chance agreement. As a result, he should not have been declared in breach of the agreement and removed from his position.

The government responds that Mr. Gilbert's non-compliance with the last-chance agreement was material. It argues that an important benefit DEA expected to receive from the agreement was the assurance that Mr. Gilbert was in compliance with the agreement. The government asserts that DEA was deprived of that benefit when Mr. Gilbert stopped being treated by Dr. Meegan, failed to see another doctor, and did not tell DEA that he was not being treated by anybody. The government points to the AJ's statement that "Mr. Getz reasonably testified that it was absolutely *imperative* for the agency to monitor the appellant's adherence to a rehabilitation/counseling program to ensure, to the extent possible, he would not engage in the type of egregious conduct constituting the basis for the first proposed disciplinary action." *Initial Decision* at 7 (emphasis added). The government asserts that, because Mr. Gilbert breached the last chance agreement, he forfeited his right to appeal the removal that resulted from the breach. Accordingly, the government contends that the Board did not err in dismissing his appeal for lack of jurisdiction.

### II.

■■■ "A last-chance agreement is a settlement agreement, and a settlement agreement is a contract." *Link*, 51 F.3d at 1582 (citing *Greco v. Dep't of the Army*, 852 F.2d 558, 560 (Fed.Cir.1988)). A party breaches a contract when it is in material non-compliance with the terms of the contract. *Id.* ("A party ... may establish breach [of a contract] by proving that the other party failed to comply with a provision of the contract in a way that was material ...." (citing *Stone Forest Indust., Inc. v. United States*, 973 F.2d 1548, 1551–53 (Fed.Cir.1992))). In *Thomas v. Department of Housing and Urban Development*, 124 F.3d 1439 (Fed.Cir.1997), we stated that "[a] breach is material when it relates to a matter of vital importance, or goes to the essence of the contract." *Id.* at 1442 (citing 5 Arthur L. Corbin, *Corbin on Contracts* § 1104 (1964)). Under this formulation, the determination of whether non-compliance with the terms of a contract is material, so as to constitute a breach, is a mixed question of fact and law. What was required by way of contract performance turns on contract interpreta-

tion, which is an issue of law. *Mass. Bay Transp. Auth. v. United States,* 129 F.3d 1226, 1231 (Fed.Cir.1997). At the same time, the conduct of the allegedly breaching party—in other words, what the party did or did not do—is an issue of fact. Where, as here, the facts are undisputed, the determination of whether there has been material non-compliance with the terms of a contract, and hence breach, necessarily reduces to a question of law. *See Carborundum Co. v. Molten Metal Equip. Innovations,* 72 F.3d 872, 878 (Fed.Cir.1995) (stating that where "the only issue is one of law to be applied to an undisputed set of facts, we have plenary review of the court's decision").

### III.

■ Our inquiry as to whether Mr. Gilbert's non-compliance with certain terms of the last-chance agreement was material, so as to result in a breach of contract, begins with the terms of the agreement. The last-chance agreement identified the obligations on the part of Mr. Gilbert that the parties believed were material. The agreement states what Mr. Gilbert's obligations were in subparagraphs (d)-(k) of paragraph II. and then sets forth in subparagraph (*l*) the actions on his part that would trigger his removal by the agency. As already seen, in subparagraph (*l*), the parties agreed that Mr. Gilbert would be removed upon the occurrence of any one of the following events:

1. any alcohol related incident or misconduct (either on-duty or off-duty), or

2. any serious violation of DEA Standards of Conduct (defined to be any misconduct sustained by a Deciding Official for which a penalty of a 15–day suspension or more, to include demotions and removals[,] is imposed), or

3. SA Gilbert's failure to participate [in] and complete the programs identified in paragraph d above and any associated after-care requirements, or

4. SA Gilbert's failure to immediately notify DEA of SA Gilbert's failure to complete the programs identified in paragraph d above, and any associated after-care requirements, or

5. SA Gilbert's testing positive for alcohol as a result of an appropriate test. . . .

Turning to the facts, the agency removed Mr. Gilbert for three reasons: (1) his failure to comply with Ms. Fulmore's request for a report from Dr. Meegan by March 2, 2001; (2) his failure to timely furnish the April 1, 2001 quarterly report required by paragraph II.(f) of the last-chance agreement; and (3) his failure to either see Dr. Meegan after December 6, 2000, or to visit another health care provider for after-care treatment, combined with his failure to inform the agency until April of 2001 that he was not receiving after-care treatment. In removing Mr. Gilbert, the agency invoked the provisions of subparagraphs (*l*) 3 and (*l*) 4 of paragraph II. of the last-chance agreement.

We note at the outset that neither Mr. Gilbert's failure to provide Dr. Meegan's report by March 2nd nor his failure to timely provide the April 1st quarterly report is listed in paragraph II.(*l*) of the last-chance agreement as an event that would trigger Mr. Gilbert's removal. That does not mean that Mr. Gilbert was not required to comply with Ms. Fulmore's request for a report from Dr. Meegan, or that he was free to ignore the deadline for the quarterly report. What it does mean, however, is that DEA chose not to make such failures on Mr. Gilbert's part acts of material non-compliance under the last-chance agreement. Put another way,

DEA chose not to designate such failures on Mr. Gilbert's part as breaches of the agreement. In any event, on April 9, 2001, Mr. Gilbert sent Ms. Fulmore a memorandum which he asked to be considered his April 1 quarterly report and which she received on April 16th.

That brings us to the third reason advanced by the agency for its finding that Mr. Gilbert breached the last-chance agreement: his failure, after December 6th, to return to Dr. Meegan or to see some other health care provider, combined with his failure to inform DEA of those facts until April of 2001. The question is whether, as asserted by the agency and as found by the Board, those failures brought Mr. Gilbert within the scope of subparagraph 3 ("SA Gilbert's failure to participate [in] and complete the programs identified in paragraph d above and any associated after-care requirements") or subparagraph 4 ("SA Gilbert's failure to immediately notify DEA of SA Gilbert's failure to complete the programs identified in paragraph d above, and any associated after-care requirements") of the last-chance agreement. If Mr. Gilbert did not fail to perform his obligations under paragraph II.(d), the requirement to notify of failure to perform could not be breached. Therefore we need to determine whether Mr. Gilbert came within the scope of subparagraph 3 by failing to participate in, and complete, "the programs identified in paragraph d" of the last-chance agreement, as well as any "associated after-care requirements." Because Mr. Gilbert completed "the programs identified in paragraph d" and did not fail to participate in "associated after-care requirements," we hold that the Board erred in its determination that Mr. Gilbert was in material non-compliance with his paragraph II.(d) obligations.

In paragraph II.(d) of the last-chance agreement, Mr. Gilbert agreed that he would continue to participate in, and that he would successfully complete, "an alcohol rehabilitation, treatment, and counseling program." He also agreed that he would participate in "any after-care/monitoring program ... required after he ... completed the alcohol rehabilitation, treatment, and/or counseling program." It is undisputed that Mr. Gilbert successfully completed an "alcohol rehabilitation, treatment, and counseling program." After being in the in-patient program at Marworth, he participated in the program of group therapy sessions at Clark and Clark, and he was treated by Dr. Meegan beginning in 1999 after he left Marworth and throughout 2000. That Mr. Gilbert successfully completed his program of "rehabilitation, treatment, and/or counseling" is evidenced by the fact that he passed his fitness for duty examination and was allowed to return to work in December of 2000.

The critical question, then, is whether Mr. Gilbert failed to participate in and substantially complete his required "after-care/monitoring program." The AJ stated that Mr. Gilbert was required to

> demonstrate, on a continuing basis his participation in a rehabilitation/counseling program. The appellant's failure to comply with this requirement constituted a material breach of the settlement contract because it inhibited the agency's ability to timely monitor the appellant's rehabilitative progress and verify his completion of the after-care program.

*Initial Decision* at 7. In our view, however, the undisputed facts do not support the AJ's finding that Mr. Gilbert was in material non-compliance with the requirement that he participate in an after-care/monitoring program.

The "after-care/monitoring program" at issue for determining Mr. Gilbert's compliance with the last-chance agreement is Mr. Gilbert's treatment under the care of Dr. Meegan. This treatment began after Mr. Gilbert's completion of the program at Marworth Treatment Facility in March of 1999. As discussed above, on April 18, 2001, Dr. Meegan told DEA's Dr. Pamela Adams about Mr. Gilbert's therapy sessions with him in 1999 and 2000, and he stated that Mr. Gilbert "was a compliant patient who participated in therapy willingly and cooperatively." Dr. Meegan also stated that he was "unaware of any recurring problems with alcohol" and that he was "unaware of any recurring problems with noncompliance." Four days later, on April 23, 2001, Dr. Meegan provided Sharon Crawford of DEA with the same information that he had given to Dr. Adams. In addition, he indicated that, as of December 6, 2000, he anticipated that, during the period of the next four to six months, Mr. Gilbert's after-care treatment would have required one to three visits of a follow-up nature. It was Dr. Meegan's opinion that, as far as Mr. Gilbert was concerned, a mental health provider "would have had a difficult time documenting a continued, ongoing need for treatment." Dr. Meegan confirmed that Mr. Gilbert had sought to schedule an appointment after the Christmas holidays but that he had been unable to do so because his medical insurance coverage had changed. Finally, Dr. Meegan reiterated in his testimony that as of December 2000, Mr. Gilbert had fully and completely complied with his after-care requirements and that he would have planned to see Mr. Gilbert at most "two or three" more times after their last meeting on December 6, 2000. Dr. Meegan went on to testify that those two or three additional meetings "would have been insignificant, given the level of symptom management, given the reduction of issues and

problems, given his adaptation at the time, and given the extent of his self-care and self-help use of resources." The documents of record and Dr. Meegan's uncontradicted testimony make it clear that Mr. Gilbert participated in, and essentially completed, his required "after-care/monitoring program" putting him in substantial compliance with paragraph II.(d) of the last-chance agreement.

The government responds, however, that, notwithstanding his after-care treatment with Dr. Meegan, Mr. Gilbert still was in material non-compliance with the last-chance agreement. The government points to the fact that it was not until April of 2001 that Mr. Gilbert informed DEA that he had not seen either Dr. Meegan or any other health care provider after his visit to Dr. Meegan in December of 2000. The government urges that, under these circumstances, Mr. Gilbert's removal was triggered under paragraph II.(l) 4 of the last-chance agreement because he failed "to immediately notify DEA of [his] failure to complete ... associated after-care requirements." According to the government, an important benefit for which DEA bargained in the last-chance agreement was "assurance that Mr. Gilbert was in compliance with the requirements of the [agreement] to ensure public safety." Mr. Getz, Special Assistant/Deciding Official, testified that

> ... Mr. Gilbert was put back to work on [December 14, 2000]. And during the whole time that he was employed, he was not seeing a psychotherapist. The agency was put in a position that we were held in the dark. We had no idea whether or not he had any relapses, whether he was continuing in his after-care program and doing the things that are required.... He just failed to give us the opportunity for us to know what was going on with regard to his alcohol-

ism.... This [last chance] agreement was put together to enable us to be able with some certainty to indicate that we have every reason to believe that he is in this status of full remission, sustained full remission.

We are unable to accept the government's argument. We agree with the government that paragraph II.(*l*) 4 of the last-chance agreement made it clear that Mr. Gilbert would be in material non-compliance with the agreement if he failed to inform DEA that he was not participating in any "after-care/monitoring program," as required by paragraph II.(d) of the agreement. However, unless paragraph II.(d) of the agreement is breached, the notification requirement of subparagraph 4 is not triggered. As discussed above, the facts establish that Mr. Gilbert participated in, and essentially completed, his required "after-care/monitoring program." Under these circumstances, he was not required under paragraph II.(*l*) 4 to notify DEA of a breach of his after-care obligations, because there was no such breach.

To be sure, Mr. Gilbert was not diligent in making arrangements for seeing another mental health care provider after his insurance coverage changed. In addition, he only notified Ms. Fulmore in April of 2001 that he was pursuing efforts to see another psychologist. However, these circumstances do not change the fact that Mr. Gilbert was not in material non-compliance with the last-chance agreement by reason of failure to participate in a required "after-care/monitoring program." Accordingly, the requirement to immediately notify DEA of any such failure was not triggered. In sum, Mr. Gilbert did not breach the last-chance agreement.[1]

## CONCLUSION

For the foregoing reasons, we hold that the Board erred in concluding that Mr. Gilbert breached the last-chance agreement so as to trigger his removal under the provisions of the agreement and the waiver of his appeal rights. Accordingly, the decision of the Board is reversed. The case is remanded to the Board. Since it has been determined that Mr. Gilbert did not breach the last-chance agreement, the Board is to instruct the agency to reinstate Mr. Gilbert to his position and to afford him such incidental relief as may be appropriate.

REVERSED and REMANDED.

---

1. We do not in any way suggest that the government lacks a substantial interest in monitoring the ability of its employees to remain alcohol-free after treatment has been completed. We hold only that in this particular case the employee substantially complied with the required "after-care/monitoring program."