# United States Court of Appeals for the Federal Circuit

---

**ASPEN CONSULTING, LLC,**
*Appellant*

**v.**

**SECRETARY OF THE ARMY,**
*Appellee*

---

2021-1381

---

Appeal from the Armed Services Board of Contract Appeals in No. 61122, Administrative Judge Owen C. Wilson, Administrative Judge Richard Shackleford, Administrative Judge Timothy Paul McIlmail.

---

Decided: February 9, 2022

---

IAN CRONOGUE, Baker, Cronogue, Tolle & Werfel, LLP, McLean, VA, argued for appellant. Also represented by GERALD HOWARD WERFEL.

CORINNE ANNE NIOSI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellee. Also represented by BRIAN M. BOYNTON, MARTIN F. HOCKEY, JR., PATRICIA M. MCCARTHY; ALLEN SCOTT BLACK, United States Army Corps of Engineers, Little Rock, AR.

---

Before MOORE, *Chief Judge*, DYK and CUNNINGHAM,
*Circuit Judges.*

DYK, *Circuit Judge*.

Aspen Consulting, LLC, ("Aspen") appeals a final decision of the Armed Services Board of Contract Appeals (the "Board"). The Board denied Aspen's appeal, which sought compensation for the U.S. Army Corps of Engineers' (the "government's") failure to deposit contractually owed payments in the account designated in the contract. We reverse the Board's finding that the government did not breach the contract and remand for further proceedings consistent with this opinion. On remand, the Board must determine whether the government has established an affirmative defense of payment.

### BACKGROUND

Aspen is based in San Antonio, Texas. In 2013, Aspen received a government contract to outfit United States military health and dental clinics in Germany ("the contract" or "the Vilseck project"). The contract contains a payment clause, incorporating Federal Acquisition Regulation ("FAR") 52.232-33 (2003), which states:

> The Government shall make payment to the Contractor using the [Electronic Funds Transfer] EFT information contained in the Central Contractor Registration (CCR) database. In the event that the EFT information changes, the Contractor shall be responsible for providing the updated information to the CCR database.

J.A. 233. FAR 52.232-33 was promulgated in 1999 to facilitate an efficient shift to mandatory federal EFT payments required by the Debt Collection Improvement Act of 1996, and was amended in 2003 to require that contractors "provide certain business information, including

their . . . (EFT) information only once into a common Governmentwide data source." 68 Fed. Reg. 16,366 (Apr. 3, 2003). The Department of Defense intended for the CCR database to be the "primary Government repository for Contractor information required for the conduct of business with the Government." *Id.* at 16,369. A separate FAR provision, which was not incorporated into Aspen's contract with the government, details procedures for government payments using EFT information not listed in the CCR database. *See* FAR 52.232-34 (2013). The CCR database designated an Aspen Bank of America account as the proper place for payment. The government directed its first twelve payments under the contract to that account, but directed its next two payments, totaling $264,470.70, to an account at Commerzbank AG ("CZ account") that was not listed in the CCR database.

The CZ account was opened in 2008 by Aspen's Senior Vice President and Chief Operating Officer, Ben French, who was based in Germany and was responsible for overseeing day-to-day management of the Vilseck project. French opened the CZ account "with Aspen's knowledge," and "Aspen regularly transferred funds to the" CZ account. J.A. 262. Aspen used the CZ account to pay employee wages in Euros, to pay German- and U.S.-based subcontractors and vendors, and to receive payments for other non-government work that it performed in Germany. Even though the account was regularly used for Aspen business in Germany, the company's U.S.-based owners and officers, Gaye and Kent Toppert, lacked signatory authority and could not withdraw funds from the account. Still, Aspen often requested and promptly obtained copies of the CZ account statements from French.

In January 2015, citing concerns that Aspen "would not be able to meet [its] financial obligations . . . related to [the] Vilseck Project," J.A. 762, French requested that the contracting officer send the monthly Vilseck payment

4          ASPEN CONSULTING, LLC v. SECRETARY OF THE ARMY

"directly into [a] German Aspen Account at Commerzbank," J.A. 863. In an email to the contracting officer requesting the payment change, French (through his assistant) urged that paying to the CZ account would "make things much easier" for "tax purposes" and help "keep [Aspen's] records straight." *Id.* Even though Aspen's account as listed in the CCR database never changed, and the contract's express terms required that all payments be directed to that account, the government made two payments—in February and March 2015—to the CZ account.

In May 2015, Mrs. Toppert realized that the Vilseck project's two invoices had not been paid to the Bank of America account designated in the CCR database. She informed the government that its payments to the CZ account failed to comply with the contract's FAR clause and sent the government a request for payment to recover the funds. When the contracting officer contacted French, French maintained that the account was "fully legitimate" and that Mrs. Toppert was "apprised of the fact that it [was] being used to pay Vilseck [project] related vendor invoices." J.A. 289.

In March 2016, the government denied the request for payment. The government maintained that it was not improper to pay the CZ account because Aspen held French out as having "apparent authority to negotiate" on behalf of Aspen and "to sign contract modifications, submit invoices, submit requests for equitable adjustments[,] and submit delay cost proposals." J.A. 428. The government also noted that Mrs. Toppert "was aware of the CZBank account which was receiving and disbursing funds for Aspen," and concluded that "payments which would duplicate those already made to and received by Aspen Consulting LLC [could not] be issued." *Id.*

In July 2016, Aspen filed a certified claim with the contracting officer to recover $264,470.79 plus interest—the value of the allegedly misdirected payments. The contracting officer's final decision denied the claim because French had apparent authority to direct payment to the CZ account, and because the payments, despite not complying with the contract's payment terms, "were used to satisfy Aspen['s] . . . debts and obligations." J.A. 60. Aspen appealed to the Board.

In October 2020, the Board issued its final written decision denying Aspen's appeal. The Board's decision noted that the relevant FAR provision stated, "the Contractor shall be responsible for providing the updated information to the CCR database." J.A. 3. The Board concluded that this implied that a contractor could change its EFT information before updating it in the CCR database. The Board determined also that French had done so, had at least apparent authority to do so, and that any failure to update the information in the CCR database by the time payment was made was Aspen's fault, not the government's. As a result, the Board found that the government did not breach the contract by failing to pay the account listed in the CCR database. The Board did not reach the question whether the government's payments to the CZ account could eliminate the government's liability if Aspen benefitted from the payments. Aspen appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).

## DISCUSSION

The Board's interpretation of a contract, including "[i]nterpretation and application of the FAR," *Sec'y of Def. v. Northrop Grumman Corp.*, 942 F.3d 1134, 1139 (Fed. Cir. 2019), is a legal question that we review de novo, 41 U.S.C. § 7107(b)(1); *Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1350 (Fed. Cir. 2016) (citing *S. Nuclear Operating Co. v. United States*, 637 F.3d 1297, 1301 (Fed. Cir.

2011)).  The Board's factual findings are conclusive unless they are "fraudulent, arbitrary, or capricious," "so grossly erroneous as to necessarily imply bad faith," or "not supported by substantial evidence."  § 7107(b)(2)(A)–(C).

A

Aspen argues that the Board erred in denying its breach of contract appeal because the Board erroneously interpreted the contract's FAR clause; the government breached the contract by making payments to the CZ account; and the government's breach was material.

"A party breaches a contract when it is in material non-compliance with" its terms.  *Gilbert v. Dep't of Just.*, 334 F.3d 1065, 1071 (Fed. Cir. 2003).  "What was required by way of contract performance" is a question of law, and what the "allegedly breaching party . . . did or did not do" in relation to that required performance is a question of fact. *Id.* at 1071–72 (citing *Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1231 (Fed. Cir. 1997)).  Whether a party's "non-compliance with the terms of a contract is material, so as to constitute a breach, is a mixed question of fact and law."  *Id.* at 1071.

To assess whether the government breached the contract, we start with the text of the FAR clause, the "plain and unambiguous" meaning of which controls.  *Arko Exec. Servs., Inc. v. United States*, 553 F.3d 1375, 1379 (Fed. Cir. 2009) (quoting *Hercules Inc. v. United States*, 292 F.3d 1378, 1380–81 (Fed. Cir. 2002)).  The incorporated FAR clause states, in part, "[t]he Government shall make payment to the Contractor using the EFT information contained in the Central Contractor Registration (CCR) database."  J.A. 233.  The plain language unambiguously requires the government to pay Aspen using the EFT information contained in the CCR database.  Its use of mandatory language, that payments "shall" be made "using the EFT information . . . in the [CCR] database," indicates that

the contract afforded the government no discretion to pay an account other than the one listed in the CCR database.

Other language in the payment clause addresses changes to a party's EFT information and states, "In the event that the EFT information changes, the Contractor shall be responsible for providing the updated information to the CCR database." *Id.* The Board concluded that this language contemplates that a contractor could change its EFT information "by requesting that payments be made to a 'new' bank account [] before updating that information in CCR." J.A. 3. The fact that the payment clause contemplates that a party's EFT information could change—i.e. that the location where a party wishes to receive its deposits could change—does not mean that the payment clause permits a party to change its contractually-relevant EFT information by any process other than updating it in the CCR database.

It is undisputed that when the government made the two payments to the CZ account, no one from Aspen had changed its EFT information in the CCR database from the Bank of America account to the CZ account. Indeed, French could not have changed the EFT information because he did not possess the login credentials required to access the CCR database. While French may have had apparent authority to change the contract's payment provision (for example, to incorporate FAR 52.232-34 (discussed below) instead of 52.232-33), no such contractual change was ever made.

Alternatively, the government claims that its failure to pay the account listed in the CCR database was an immaterial non-compliance with the FAR clause, which did not breach the contract. We conclude that the government's breach was material because the FAR clause serves an important purpose for both parties: it protects the government and the contractors who do business with it. The

CCR database provides a central location for the government to check for a contractor's EFT information, and it relieves contractors of the burden of providing that information to the government more than once.  Under the Board's interpretation, a contractor would have discretion to request that outstanding payments be directed to unlisted accounts.  The government would carry the burden of assessing whether the individual making the request possessed the requisite authority to change the location of payment.  As a result, the government would be exposed to increased liability for paying into wrong accounts (if the individual lacked authority) or for failing to pay the newly requested account (if the individual had the requisite authority).  Adhering to the account listed in the CCR database allows contractors to easily change and oversee the accuracy of their payment information and benefits the government "by streamlining where" it can find a contractor's "pertinent EFT information."  Government's Br. 31.

So too, the fact that the parties' contract did not incorporate FAR 52.232-34, which allows for payments to accounts other than those listed in the CCR database, is significant evidence that the contract did not contemplate the use of an account other than the one listed in the CCR database.[1]

---

[1]    FAR 52.232-34 states, in relevant part:

> (a) Method of payment. (1) All payments by the Government under this contract shall be made by electronic funds transfer (EFT) except as provided in paragraph (a)(2) of this clause. . . .

> (b) Mandatory submission of Contractor's EFT information. (1) The Contractor is required to provide the Government with the

In sum, we conclude that the government breached the contract by making its payments to an account other than the one listed in the CCR database, and that this breach was material.

B

The government presents an alternative ground for affirming the Board: that "Aspen's use of, and benefit from, the [CZ] account" in conjunction with "evidence that the alleged misdirected payments were . . . used to pay Aspen's obligations" establish the affirmative defense of payment, which extinguishes the government's contractual liability. Government's Br. 35.

A defendant may defend against a claim for breach of its payment obligations if the defendant proves that the plaintiff was paid. *See* U.C.C. § 3-602. Payment is an affirmative defense, and the defendant bears the burden of proof. *See* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1270 (4th ed. 2021). A debtor who makes contractually required payments to a third party or to a different account will have a "valid defense" to a breach of contract claim if it can show that the

---

information required to make payment by EFT (see paragraph (j) of this clause). . . .

(j) EFT information. The Contractor shall provide the following information to the designated office. The Contractor may supply this data for this or multiple contracts (see paragraph (b) of this clause). The Contractor shall designate a single financial agent per contract capable of receiving and processing the EFT information using the EFT methods described in paragraph (c) of this clause.

misdirected payments benefitted the creditor.[2]  *Weiss v. Dist. Title. Ins. Co.*, 121 F.2d 900, 901–02 (D.C. Cir. 1941). In *Weiss*, faced with a creditor's claim that a debtor breached the parties' written agreement by misdirecting funds to an unauthorized recipient, the D.C. Circuit held that the debtor pled a valid payment defense because the misdirected funds were later "applied in payment of [the creditor's] debt" such that the creditor received "the benefit of the payment." *Id.* at 902.

The parties dispute whether depositing funds into the CZ account benefitted Aspen.  This is not an issue we can properly resolve on appeal.  The question whether Aspen benefitted from the misdirected payments "is necessarily a fact-intensive task" that the Board must address in the first instance. *Cmty. Health Choice, Inc. v. United States*, 970 F.3d 1364, 1379–80 (Fed. Cir. 2020).  If the government establishes that the misdirected funds in the CZ account were subsequently used for Aspen's benefit, Aspen must "incorporat[e] those cost savings into its damages calculation," *Boston Edison Co. v. United States*, 658 F.3d 1361, 1369 (Fed. Cir. 2011), and the Board is "required to credit the government" with the value of those funds used for Aspen's benefit, *Cmty. Health*, 970 F.3d at 1379. *See also Kan. Gas & Elec. Co. v. United States*, 685 F.3d 1361, 1367 (Fed. Cir. 2012) ("[W]here the defendant's wrong or breach

---

[2]    Aspen relies on *In re S.A.S. Bianchi Ugo fu Gabbriello*, ASBCA No. 53800, 05-2 B.C.A. ¶ 33,089, to establish that payment to an incorrect account that benefits the creditor cannot satisfy the government's payment obligations. This decision, of course, is not binding on this court. To the extent that *Bianchi* holds that the government cannot prevail on a payment defense even if it proves that the creditor "obtained a financial benefit from" the misdirected payment, *id.*, that decision is inconsistent with our decision here.

of contract . . . has also conferred a benefit . . . the value of this benefit must be credited to defendant in assessing the damages." (quoting *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1372 (Fed. Cir. 2003))); *S. Nuclear*, 637 F.3d at 1304 ("[A] defendant must move forward by pointing out the costs it believes the plaintiff avoided because of its breach. . . . Only then does the burden shift to the plaintiff to incorporate those saved costs. . . ." (citing *Mech-Con Corp. v. West*, 61 F.3d 883, 886 (Fed. Cir. 1995))).

## CONCLUSION

We reverse the Board's finding that the government did not breach the contract and remand to the Board for proceedings consistent with this opinion.

### **REVERSED AND REMANDED**

### COSTS

No costs.