# United States Court of Appeals for the Federal Circuit

---

**CITY OF FRESNO, ARVIN-EDISON WATER STORAGE DISTRICT, CHOWCHILLA WATER DISTRICT, DELANO-EARLIMART IRRIGATION DISTRICT, EXETER IRRIGATION DISTRICT, IVANHOE IRRIGATION DISTRICT, LINDMORE IRRIGATION DISTRICT, LINDSAY-STRATHMORE IRRIGATION DISTRICT, LOWER TULE RIVER IRRIGATION DISTRICT, ORANGE COVE IRRIGATION DISTRICT, PORTERVILLE IRRIGATION DISTRICT, SAUCELITO IRRIGATION DISTRICT, SHAFTER-WASCO IRRIGATION DISTRICT, SOUTHERN SAN JOAQUIN MUNICIPAL UTILITY DISTRICT, STONE CORRAL IRRIGATION DISTRICT, TEA POT DOME WATER DISTRICT, TERRA BELLA IRRIGATION DISTRICT, TULARE IRRIGATION DISTRICT, LOREN BOOTH LLC, MATTHEW J. FISHER, JULIA K. FISHER, HRONIS INC., CLIFFORD R. LOEFFLER, MAUREEN LOEFFLER, DOUGLAS PHILLIPS, CARALEE PHILLIPS,**
*Plaintiffs-Appellants*

v.

**UNITED STATES, SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, SANTA CLARA VALLEY WATER DISTRICT, SAN LUIS WATER DISTRICT, WESTLANDS WATER DISTRICT, GRASSLAND WATER DISTRICT, JAMES IRRIGATION DISTRICT, BYRON BETHANY IRRIGATION DISTRICT, DEL PUERTO WATER DISTRICT, SAN JOAQUIN RIVER EXCHANGE CONTRACTORS WATER AUTHORITY, CENTRAL CALIFORNIA IRRIGATION DISTRICT, FIREBAUGH CANAL**

**WATER DISTRICT, SAN LUIS CANAL COMPANY,
COLUMBIA CANAL COMPANY,**
*Defendants-Appellees*

————————————

2022-1994

————————————

Appeal from the United States Court of Federal Claims in No. 1:16-cv-01276-AOB, Judge Armando O. Bonilla.

————————————

Decided:  December 17, 2024

————————————

ROGER J. MARZULLA, Marzulla Law, LLC, Washington, DC, argued for plaintiffs-appellants.  Also represented by NANCIE GAIL MARZULLA; TIMOTHY E. METZINGER, CRAIG A. PARTON, Price, Postel & Parma LLP, Santa Barbara, CA.

MATTHEW JUDE CARHART, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States.  Also represented by MICHAEL D. GRANTSON, ELIZABETH MARIE HOSFORD, PATRICIA M. MCCARTHY, VINCENT DE PAUL PHILLIPS, JR.

DANIEL O'HANLON, Kronick Moskovitz Tiedemann & Girard, Sacramento, CA, argued for defendants-appellees Byron Bethany Irrigation District, Central California Irrigation District, Columbia Canal Company, Del Puerto Water District, Firebaugh Canal Water District, Grassland Water District, James Irrigation District, San Joaquin River Exchange Contractors Water Authority, San Luis Canal Company, San Luis & Delta-Mendota Water Authority, San Luis Water District, Santa Clara Valley Water District, Westlands Water District.  San Luis & Delta-Mendota Water Authority also represented by REBECCA AKROYD, San Luis & Delta-Mendota Water Authority, Sacramento, CA.

DAVID THOMAS RALSTON, JR., Foley & Lardner LLP, Washington, DC, for defendants-appellees Byron Bethany Irrigation District, Del Puerto Water District, James Irrigation District. Also represented by JULIA DI VITO, FRANK S. MURRAY.

PAUL MINASIAN, Minasian, Meith, Soares, Sexton & Cooper, LLP, Oroville, CA, for defendants-appellees Central California Irrigation District, Columbia Canal Company, Firebaugh Canal Water District, San Joaquin River Exchange Contractors Water Authority, San Luis Canal Company. Also represented by ANDREW J. MCCLURE, JACKSON A. MINASIAN.

ELLEN WEHR, Wehr Water Law & Policy, Sacramento, CA, for defendant-appellee Grassland Water District.

THOMAS M. BERLINER, Duane Morris LLP, San Francisco, CA, for defendant-appellee San Luis Water District. Also represented by ROBERT M. PALUMBOS, Philadelphia, PA.

ANDREW GSCHWIND, Santa Clara Valley Water District, San Jose, CA, for defendant-appellee Santa Clara Valley Water District. Also represented by ANTHONY TOMMY FULCHER.

ANDREW SHIPLEY, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, for defendant-appellee Westlands Water District. Also represented by DANIEL VOLCHOK.

ALEX M. PELTZER, Peltzer & Richardson, Visalia, CA, for amici curiae Eastern Tule Groundwater Sustainability Agency, Greater Kaweah Groundwater Sustainability Agency, Mid-Kaweah Groundwater Sustainability Agency, Pixley Irrigation District Groundwater Sustainability Agency. Also represented by JOSH TODD FOX, Ruddell, Stanton, Bixler, Mauritson & Evans, LLP, Visalia, CA.

MATTHEW GORDON ADAMS, Kaplan Kirsch & Rockwell LLP, San Francisco, CA, for amicus curiae Friant Water Authority.   Also represented by WILLIAM CADE MUMBY; SAMANTHA RACHEL CARAVELLO, Denver, CO.

_____

Before MOORE, *Chief Judge*, CLEVENGER and STARK, *Circuit Judges*.

STARK, *Circuit Judge*.

In this case, we are called upon to review how the federal government resolved a particular dispute over water distribution during the drought-ridden year of 2014. As we explain in more detail below, individual growers, irrigation districts (which provide water to farms), water districts (which provide water to municipalities), and the City of Fresno, all located within the area served by the Central Valley Project ("CVP" or "Project"), sued the United States ("government") over its failure to deliver water they contend they were entitled to under a series of contracts.  The government defended its water allocation decisions by pointing to obligations it had under other contracts, to deliver water to another set of entities. Through adjudication of a series of motions, the Court of Federal Claims dismissed several of the plaintiffs' claims and granted summary judgment to the government on all remaining claims.

Because we agree with the disposition of the Court of Federal Claims, we affirm.

I

A

The Central Valley of California lies in the center of the state, to the west of the Sierra Nevada mountains and to the east of the Coastal Ranges.   The Central Valley, through which the Sacramento River and the San Joaquin River flow, is home to the largest federal water management project in the United States: the CVP.   The

CVP consists of dams, reservoirs, hydropower stations, canals, and other infrastructure operated by the United States Bureau of Reclamation ("Reclamation"). Through its operation of the CVP, Reclamation controls water from the Sacramento and San Joaquin Rivers and allocates those waters throughout California.

The Sacramento River has substantial water resources, but the land abutting it is not generally suitable for agriculture. By contrast, the San Joaquin River lacks sufficient water to meet all the agricultural and other needs of the San Joaquin Valley. The CVP aims to "re-engineer its natural water distribution," *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 728 (1950), addressing the mismatch between where water is abundant, but arguably less needed, and where it is scarce, yet could – if diverted – be put to more efficient agricultural benefit. *See generally Gustine Land & Cattle Co. v. United States*, 174 Ct. Cl. 556, 560-61 (1966).

The CVP consists of multiple "divisions." Most pertinent to this case is the Friant Division, which includes the Friant Dam, where Reclamation collects water originating in the San Joaquin River and stores that water in Millerton Lake. From Millerton Lake, the water is distributed to water and irrigation districts through the Madera and Friant-Kern Canals.[1]

Key features of the CVP that are pertinent to the background and analysis of the issues presented in this appeal are shown in Figure 1, an annotated map, below.[2]

---

[1]    For simplicity, and because it does not impact the analysis, we use "water district" throughout the remainder of this opinion to refer to both water districts and irrigation districts.

[2]    *See* Friant Water Authority Amicus Curiae Br., ECF No. 52 at 2 (further annotations added by court).



Figure 1.  Map of Central Valley

## B

Reclamation's role in the CVP includes obtaining rights to water resources in the Central Valley and undertaking commitments to deliver those waters. Prior to the inception of the CVP, various private entities owned rights to San Joaquin River water. These entities, which we (like the parties) refer to as the "Exchange Contractors,"[3] are successors to parties that entered into various agreements with the government. In one such agreement, which we will call the "Purchase Contract," the predecessors of the Exchange Contractors sold the bulk of their rights to San Joaquin River water to the government while at the same time reserving their rights to San Joaquin River water "in excess of specified rates of flow" identified in Schedule 1 of the Purchase Contract ("reserved waters"). J.A. 232-83, 314. The same parties then executed a "Contract for the Exchange of Waters" (the "Exchange Contract"), which granted Reclamation authority to "store, divert, dispose of and otherwise use" even these "reserved waters" – that is, the Exchange Contractors' predecessors' Schedule 1 "reserved waters" from the San Joaquin River.[4] J.A. 315-16.

---

[3]  We use "Exchange Contractors" to refer to, collectively, the parties that intervened in this litigation to join the government's defense: San Luis & Delta-Mendota Water Authority, Westlands Water District, Santa Clara Valley Water District, San Luis Water District, Grassland Water District, James Irrigation District, Byron Bethany Irrigation District, Del Puerto Water District, San Joaquin River Exchange Contractors Water Authority, Central California Irrigation District, Firebaugh Canal Water District, San Luis Canal Company, and Columbia Canal Company.

[4]  The Exchange Contract has been amended several times. The version in effect at the pertinent time, 2014, is

Because all the rights of the Exchange Contractors' predecessors now indisputably are held by the Exchange Contractors, we will at this point dispense with referring to the predecessors, except where relevant.

As consideration to the Exchange Contractors, the government agreed in the Exchange Contract to provide them with "substitute water." J.A. 315-16. Specifically, Reclamation's rights to the Exchange Contractors' "reserved waters" of the San Joaquin River exist "so long as, and only so long as, the United States does deliver to the [Exchange Contractors] by means of the Project or otherwise substitute waters in conformity with this contract." J.A. 316. Article 8 of the Exchange Contract requires that a specified "Quantity of Substitute Water" be delivered to the Exchange Contractors:

> During all calendar years, other than those defined as critical, the United States shall deliver to the [Exchange Contractors] for use hereunder an annual substitute water supply of not to exceed 840,000 acre-feet in accordance with the [specified] maximum monthly entitlements.

J.A. 326. During critical years, which are those in which water is less abundant (according to specific measures set out in the Exchange Contract), the government is required to provide a lesser amount to the Exchange Contractors, a maximum of 650,000 acre-feet. Other provisions, most pertinently Article 4, describe Reclamation's obligations when there are certain interruptions to its ability to supply substitute waters to the Exchange Contractors. J.A. 315-17.

C

Having obtained from the Exchange Contractors rights to San Joaquin River water, Reclamation then contracted

---

the 1968 version. J.A. 25, 309-44. All references to the "Exchange Contract" are to this 1968 version.

to deliver water to municipal and private entities within the Friant Division. Specifically, the government entered into the "Friant Contract" with certain water districts and the City of Fresno ("Friant Contractors");[5] the Friant Contractors, in turn, deliver water to, among others, individual growers ("Friant Growers").[6] The Friant Contract requires Reclamation to deliver water, including water from the San Joaquin River, to the Friant Contractors. As consideration, the Friant Contractors agreed to pay the government for delivered water and paid part of the costs of constructing the infrastructure of the CVP.

The Friant Contract obligates the government to deliver specified amounts of water to the Friant Contractors each year, although this duty is "subject to the terms of" the pre-existing Exchange Contract. J.A. 368. In

---

[5] We use "Friant Contractors" to refer to, collectively: City of Fresno, Arvin-Edison Water Storage District, Chowchilla Water District, Delano-Earlimart Irrigation District, Exeter Irrigation District, Ivanhoe Irrigation District, Lindmore Irrigation District, Lindsay-Strathmore Irrigation District, Lower Tule River Irrigation District, Orange Cove Irrigation District, Porterville Irrigation District, Saucelito Irrigation District, Shafter-Wasco Irrigation District, Southern San Joaquin Municipal Utility District, Stone Corral Irrigation District, Tea Pot Dome Water District, Terra Bella Irrigation District, and Tulare Irrigation District. We use "Friant Growers" to refer to, collectively: Loren Booth LLC, Matthew J. Fisher, Julia K. Fisher, Hronis Inc., Clifford R. Loeffler, Maureen Loeffler, Douglas Phillips, and Caralee Phillips.

[6] All citations to the "Friant Contract" are to the 2010 version, which was in effect in 2014. The parties are in agreement that this version is representative of the governing agreements between the Friant Contractors and the United States.

particular, Article 3(n) of the Friant Contract states that "[t]he rights of the [Friant] Contractor[s] under this Contract are *subject to the terms of the contract for exchange waters*," that is, the Exchange Contract. *Id.* (emphasis added). But crucially to Appellants' case here, the government also agreed in Article 3(n) that it "will not deliver to the Exchange Contractors [under the Exchange Contract] waters of the San Joaquin River unless and until required by the terms of [the Exchange Contract]." *Id.*

Other provisions of the Friant Contract relate to other aspects of potential conflicts between the government's water delivery obligations to the Friant Contractors and those it owes to other parties, such as the Exchange Contractors. Most pertinent to this appeal are Articles 13(b) and 19(a), which provide the government some measure of immunity from liability for some of its allocation decisions. J.A. 394, 402. The extent of this immunity is disputed among the parties.

In sum, then, under the Friant Contract, the Friant Contractors are entitled to delivery of amounts of water from Reclamation, including water from the San Joaquin River. However, because the government only obtained rights to control San Joaquin River water by virtue of entering into the Exchange Contract – thereupon undertaking duties owed to the Exchange Contractors – the Friant Contract also addresses how Reclamation must navigate conflicts between its obligations to the Exchange Contractors and those it owes to the Friant Contractors.

D

As the Court of Federal Claims explained, and the parties do not dispute:

> Since 1951, Reclamation has stored and diverted the Exchange Contractors' reserved San Joaquin River water at the Friant Dam and supplied [the Exchange Contractors] with substitute water [from the Sacramento-San Joaquin River Delta]

> through the Delta-Mendota Canal. . . . Since 1962, . . . Reclamation has supplied the Friant Contractors with San Joaquin River water impounded at the Friant Dam and stored in Millerton Lake.

J.A. 25, 27.  In all years until 2014, Reclamation was able to meet its contractual obligation to supply the Exchange Contractors with substitute water by delivering water sourced solely from the Sacramento-San Joaquin River Delta, without drawing on water from the San Joaquin River.

In early 2014, due to drought conditions, the Governor of California declared a state of emergency, which eventually lasted until 2017.  Reclamation recognized it was not going to be able to meet its combined water-delivery obligations for 2014 to the Exchange Contractors and the Friant Contractors.  Thus, on February 15, 2014, Reclamation informed the Exchange Contractors that 2014 would be a "critical year," as that term is defined in the Exchange Contract.  Reclamation predicted it would only be able to allocate to the Exchange Contractors "336,000 acre-feet rather than the maximum 650,000 acre-feet critical year entitlement."  J.A. 1859-60.  Several months later, on May 13, 2014, Reclamation updated its forecasts and advised the Exchange Contractors that "[d]ue to the continued drought and unique hydrology, Reclamation [would] for the first time provide water [to the Exchange Contractors] from both Delta [i.e., Sacramento River water through the Delta-Mendota Canal] *and San Joaquin River sources*."  J.A. 1660 (emphasis added).  By drawing from these multiple sources, including San Joaquin River water, Reclamation "anticipate[d] being able to meet [the] critical year demands for the months of April through October[,] which totals 529,000" acre-feet.  *Id.*

Reclamation did, in fact, supply significant amounts of water to the Exchange Contractors between May 15 and September 27, 2014, although it thereafter released no San Joaquin River water to these entities in October,

November, or December of that year.  During 2014, Reclamation delivered approximately 540,000 acre-feet of water to the Exchange Contractors, of which roughly 209,000 acre-feet had originated in the San Joaquin River (before being sent to the Friant Dam and stored in Millerton Lake), and the other approximately 331,000 acre-feet having originated in the Sacramento River, released from the Delta-Mendota Canal.

In the meantime, in March 2014, Reclamation notified the Friant Contractors that it would not be supplying them with any water that year, other than the minimum needed for public health and safety considerations.  Ultimately, while Reclamation delivered these "health and safety" waters to the Friant Contractors (as well as carryover water from the previous year's allocation), what the Friant Contractors received in 2014 was essentially a "zero allocation."  J.A. 1888-89.

E

In October 2016, the Friant Contractors and Friant Growers (collectively, "Friant Parties" or "Appellants") filed suit against the United States in the Court of Federal Claims.[7]  The Friant Parties alleged that Reclamation's actions in 2014, and particularly Reclamation's diversion of San Joaquin River water to the Exchange Contractors instead of to them, constituted a breach of the Friant Contract.  The alleged breach caused Appellants to "suffer[] huge losses of annual and permanent crops, loss of groundwater reserves, water shortages and rationing, and [to] incur[] millions of dollars [of losses] to purchase emergency water supplies."  J.A. 198.  The Friant Parties further claimed that "[t]he water and water rights of the

---

[7]    On January 8, 2021, the Friant Parties filed a substantially identical case challenging the Bureau's 2015 water allocations.  *See City of Fresno v. United States*, No. 21-375 (Fed. Cl. Jan. 8, 2021).  That matter is currently stayed.  *See id.*, ECF No. 9. (Feb. 11, 2021).

Friant Division appropriated by the United States in 2014 were the property of Plaintiffs, and their landowners and water users, each of which are the beneficial owners of the water rights." J.A. 222. Thus, the Friant Parties alleged that the government's actions constituted takings without just compensation in violation of the Fifth Amendment.

The United States, joined by the Exchange Contractors, who intervened in the litigation, responded by arguing that Reclamation had been required under the Exchange Contract to deliver water from the San Joaquin River to the Exchange Contractors due to the drought conditions experienced in 2014, which left no other water available for Reclamation to use to meet its contractual obligations. Therefore, they contended, there had been no breach of the Friant Contract. Further, the government and Exchange Contractors (collectively, hereinafter, "Appellees") asserted that even if there had been a breach, the Friant Contract immunized the government from liability, because Reclamation's water allocation decisions had not been arbitrary, capricious, or unreasonable. Finally, Appellees insisted that the Friant Contractors and Friant Growers could not maintain a takings claim because none of these entities had a property interest in the water they expected Reclamation to deliver to them under the Friant Contract and lacked standing.

The Court of Federal Claims dismissed the Friant Growers' breach of contract claim because these entities were neither parties to nor third-party beneficiaries of the Friant Contract and, therefore, lacked standing.[8] The court also dismissed the Friant Growers' and the Friant Contractors' takings claims for lack of standing, as none of these parties possesses a property interest in water supplied to them directly (or through third parties) by Reclamation. The Friant Contractors' breach of contract claims proceeded and, after discovery, the trial court

---

[8]  This aspect of the trial court's ruling is not on appeal.

granted Appellees' motion for summary judgment and denied the Friant Contractors' cross-motions for summary judgment. These rulings were based on the court's conclusions that (a) the Friant Contractors' rights under the Friant Contract were subordinate to the rights of the Exchange Parties under the Exchange Contract; (b) the conditions in 2014 required Reclamation, under the Exchange Contract, to deliver San Joaquin River water to the Exchange Contractors, because San Joaquin River water may be treated as "substitute water;" and (c) the government was, regardless, immunized under the Friant Contract for its water allocation decisions because no reasonable factfinder could find its decisions to have been arbitrary, capricious, or unreasonable.

The Friant Parties timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II

The Friant Parties' appeal presents solely issues of law. We review de novo a determination by the Court of Federal Claims to dismiss a claim for lack of subject matter jurisdiction or failure to state a claim, as well as that court's interpretation of a contract. *See Ute Indian Tribe of the Uintah & Ouray Indian Rsrv. v. United States*, 99 F.4th 1353, 1364 (Fed. Cir. 2024)*; Gould, Inc. v. United States*, 935 F.2d 1271, 1273 (Fed. Cir. 1991). Likewise, "[w]e review the Court of Federal Claims'[] grant of summary judgment under a de novo standard of review, with justifiable factual inferences being drawn in favor of the party opposing summary judgment." *Russian Recovery Fund Ltd. v. United States*, 851 F.3d 1253, 1259 (Fed. Cir. 2017). "For Fifth Amendment takings claims, we review de novo the existence of a compensable property interest." *Fishermen's Finest, Inc. v. United States*, 59 F.4th 1269, 1274 (Fed. Cir. 2023) (internal quotation marks omitted).

## III

On appeal, the Friant Contractors contend that the Court of Federal Claims misinterpreted both the Exchange

Contract and the Friant Contract.  In particular, they argue that the Exchange Contract did not require the United States to provide San Joaquin River water to the Exchange Contractors and, thus, Reclamation breached its obligations under Articles 3(a) and 3(n) of the Friant Contract by doing so.  In the Friant Contractors' view, San Joaquin River water cannot constitute "substitute water" under the Exchange Contract because Articles 4(b) and 4(c) of that contract set out the only circumstances under which San Joaquin River water can be provided to the Exchange Contractors, and the conditions of those provisions were not met in 2014.  The Friant Contractors alternatively contend that, even if Reclamation was required by the Exchange Contract to deliver San Joaquin River water to the Exchange Contractors, it nonetheless breached the Friant Contract by delivering an amount of such water that exceeded what was required.  They also dispute the Court of Federal Claims' conclusion that the government is immune from liability for its breach of the Friant Contract.  Finally, the Friant Parties challenge the trial court's dismissal of their takings claim.

The government and Exchange Contractors ask us, instead, to endorse the analysis of the Court of Federal Claims.  They argue that the critical year circumstances Reclamation confronted in 2014, and the government's competing obligations to the Exchange Contractors and Friant Contractors, required Reclamation to source "substitute water" from the San Joaquin River for delivery to the Exchange Contractors, and required it to do so in the amounts that Reclamation actually delivered.  They further contend that, in any event, the government is immunized from any breach of the Friant Contract as long as the government's determinations were not arbitrary, capricious, or unreasonable, and here they were not.  Finally, the government and Exchange Contractors urge us to affirm the trial court's conclusion that none of the Friant Parties has a property interest in Reclamation water under state or federal law and, accordingly, there was no Fifth Amendment taking.

Our analysis of these various contentions proceeds as follows. First, we explain that the Exchange Contract broadly defines "substitute water" and expressly contemplates that Reclamation may be required, under certain circumstances, to deliver water originating in the San Joaquin River to the Exchange Contractors as "substitute water." Second, nothing about this interpretation of the Exchange Contractors' rights and Reclamation's obligations contradicts or renders meaningless Article 4 of the Exchange Contract. Third, Reclamation did not breach the Friant Contract by delivering the amounts of San Joaquin River water it supplied to the Exchange Contractors. Fourth, even if any of the actions undertaken by Reclamation were a breach of the Friant Contract, Reclamation enjoyed immunity from liability because its actions could not be found to be arbitrary, capricious, or unreasonable. Fifth, and finally, we affirm the Court of Federal Claims' dismissal of the takings claims.

A

The Friant Contractors allege that the government breached Articles 3(a) and 3(n) of the Friant Contract. Article 3(a) provides that, subject to certain conditions and limitations (which are not at issue in this appeal), the government "shall make available for delivery to the [Friant] Contractor[s] from the Project" specified amounts of water. J.A. 362. Article 3(n) then states:

> The rights of the [Friant] Contractor[s] under this Contract are *subject to* the terms of the contract for exchange waters [i.e., the Exchange Contract] . . . . The United States agrees that it will not deliver to the Exchange Contractors thereunder waters of the San Joaquin River unless and until *required* by the terms of [the Exchange Contract], and the United States further agrees that it will not voluntarily and knowingly determine itself unable to deliver to the Exchange Contractors entitled thereto from water that is available or that may become

> available to it from the Sacramento River and its
> tributaries or the Sacramento-San Joaquin Delta
> those quantities required to satisfy the obligations
> of the United States under said Exchange Contract
> and under [the Purchase Contract].

J.A. 368 (emphasis added).  The Friant Contractors allege that the government breached these provisions by delivering San Joaquin River water to the Exchange Contractors in 2014 despite not being *required* to do so by the Exchange Contract.[9]  We disagree.

To determine whether the government breached its contractual obligations, we start with the text of the relevant contracts, "the 'plain and unambiguous' meaning of which control[]."  *Aspen Consulting, LLC v. Sec'y of Army*, 25 F.4th 1012, 1016 (Fed. Cir. 2022).  An "[a]greement must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts."  *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003).

Because the issue of whether the government breached the Friant Contract turns on whether the government acted in a way that it was not *required* to act by the Exchange Contract, our analysis begins with the text of the Exchange Contract.  We start with "substitute water," which Article 3 of the Exchange Contract defines:

> The term "substitute water" as used herein
> means all water delivered hereunder at the
> points of delivery hereinafter specified to the
> Contracting Entities [i.e., the Exchange
> Parties], *regardless of source*.

J.A. 315 (emphasis added).  By stating that "all water" may be "substitute water" "*regardless of source*," this definition

---

9    It is undisputed that in 2014 "Reclamation delivered San Joaquin River-sourced water to the Exchange Contractors at Mendota Pool."  Gov't Br. at 26.

does not exclude any source from potentially providing substitute water. Thus, the Exchange Contract's definition of "substitute water" plainly does not exclude San Joaquin River water.

Other provisions of the Exchange Contract confirm that the contracting parties contemplated that San Joaquin River water might be required to be used as substitute water and delivered to the Exchange Contractors. *See, e.g.*, J.A. 321 (Article 5(d)(5)(e): "Whenever sufficient water is available *from the San Joaquin River* and/or Fresno Slough[10] to meet the needs of the [Exchange Contractors] at Mendota Pool, [Reclamation] reserves the right to make all deliveries to the [Exchange Contractors] at that point.") (emphasis added); J.A. 333 (Article 9(f): describing certain conditions applying "[w]hen less than 90 percent of the total water being delivered to the [Exchange Contractors] is *coming from the San Joaquin River* and/or the Fresno Slough") (emphasis added). Additionally, as the Court of Federal Claims correctly observed, these and other provisions of the Exchange Contract anticipate that water will be provided to the Exchange Contractors from the Mendota Pool, even though the parties understood the Mendota Pool could contain San Joaquin River-sourced water. J.A. 42 (citing Articles 5(d), 9(f), and 11).

None of this is to say that the United States is always entitled to supply San Joaquin River water as substitute water to the Exchange Contractors. The Friant Contract restricts the government's authority to do so to only those circumstances in which the government is *required* to use San Joaquin River water to meet its obligations under the Exchange Contract. J.A. 445. In other words, only when Reclamation does not have sufficient water from other sources – including the Sacramento River, Sacramento-San Joaquin Delta, and Delta-Mendota Canal – to fulfill its

---

[10]   The Fresno Slough is "at times a tributary of" the San Joaquin River. J.A. 234.

contractual duty to supply the specified quantities of substitute water to the Exchange Contractors is Reclamation *permitted* to deliver San Joaquin River water to the Exchange Contractors, because it is only in those circumstances that Reclamation is *required*, under the Exchange Contract, to do so.

Our conclusion is based on the contractual language we have discussed above, and it is also supported by two realities, which are reflected in the contracts. First, the rights to San Joaquin River water initially belonged to the predecessors of the Exchange Contractors, and they only relinquished those rights subject to the government's commitment to provide them (and their successors) with substitute water, with no limitation on the location from which that water may be sourced. As the government accurately explains:

> The context for the 1939 Exchange Contract was that the Exchange Contractors' predecessors-in-interest held senior water rights that Reclamation needed to obtain to make possible the Central Valley Project. . . . Possessing that leverage, the Exchange Contractors' predecessors-in-interest were able to protect themselves by obtaining broad "substitute water" rights in the Exchange Contract that were not limited to Delta-sourced [or Sacramento River] water.

Gov't Br. at 32.

Second, as we noted earlier and now emphasize, Article 3(n) of the Friant Contract expressly makes "[t]he rights of the [Friant] Contractor[s]," including the Friant Contractors' rights to government delivery of water, "*subject to the terms*" of the Exchange Contract. J.A. 368 (emphasis added). Thus, we agree with the Court of Federal Claims:

> [T]he Exchange Contractors are entitled to San Joaquin River water over . . . the Friant Contractors, even though it is relegated to a last

> resort source [for the Exchange Contractors] under the Friant Contract. A contrary interpretation would prioritize the clearly subordinated contractual rights of the Friant Contractors over the superior rights of the Exchange Contractors.

J.A. 42.

Therefore, we conclude that San Joaquin River water may be used by Reclamation as "substitute water" when such water is required by the Exchange Contract to be used as "substitute water," such as when the government cannot otherwise meet its obligations to the Exchange Contractors. Here, it is undisputed that during 2014, Reclamation was only able to deliver approximately 331,000 acre-feet of non-San Joaquin River water to the Exchange Contractors, thereby requiring the remaining substitute water to be sourced from the San Joaquin River to fulfill its obligations under Article 8 of the Exchange Contract. J.A. 33-34.

## B

The Friant Contractors object that our conclusion as just described cannot be squared with Article 4 of the Exchange Contract. More particularly, they contend that the Court of Federal Claims' interpretation of Article 4(a) improperly renders Articles 4(b) and 4(c) of the Exchange Contract nullities – because those are the only sections that *require* Reclamation to provide the Exchange Contractors with San Joaquin River water. We are not persuaded.

Article 4(a), entitled "Conditional Permanent Substitution of Water Supply," provides that the government may

> store, divert, dispose of and otherwise use, within and without the watershed of the aforementioned San Joaquin River, the aforesaid reserved waters of said river for beneficial use by others than [the Exchange Contractors] *so long as, and only so long as*, the United States does deliver to [the Exchange

Contractors] by means of the Project or otherwise substitute water in conformity with this contract.

J.A. 315-16 (emphasis added). In this way, Article 4(a) makes the government's ability to provide San Joaquin River water to "others," including the Friant Contractors, dependent on the government's simultaneous ability ("so long as, and only so long as") to provide substitute water to the Exchange Contractors.

Article 4(b), "Temporary Interruption of Delivery," then provides:

Whenever the United States is temporarily unable for any reason or for any cause to deliver to the [Exchange Contractors] substitute water from [the Sacramento River through] the Delta-Mendota Canal or other sources, *water will be delivered from the San Joaquin River*.

J.A. 316 (emphasis added). The San Joaquin River water to be provided during such a temporary interruption in the government's ability to deliver non-San Joaquin River substitute water to the Exchange Contractors must be (1) in the same quantities as required under Article 8 for the first seven days, and (2) for the rest of the temporary interruption, "in quantities and rates as reserved in the Purchase Contract," which (as we discuss further below) are quantities significantly *less* than the quantities owed to the Exchange Contractors under Article 8. J.A. 316. Article 4(c) goes on to address "Permanent Failure of Delivery," providing that "[w]henever the United States is permanently unable for any reason or for any cause to deliver" the Exchange Contractors the required substitute water, the Exchange Contractors "shall receive the said reserved waters *of the San Joaquin River* as specified in said Purchase Contract." J.A. 316-17 (emphasis added).

Nothing about our interpretation of the Exchange Contract, including Article 4(a), renders Articles 4(b) or 4(c) meaningless. The Friant Contractors' contrary view rests on their incorrect assumption that Articles 4(b) and

4(c) set out the sole circumstances under which San Joaquin River water is required to be delivered to the Exchange Contractors. To adopt the Friant Parties' reading – that Articles 4(b) and 4(c) are triggered on each occasion Reclamation is unable (temporarily or permanently) to meet even a small portion of its substitute water obligations to the Exchange Contractors from non-San Joaquin River sources – would materially reduce the rights the Exchange Contractors bargained for in their contract.

Reclamation may, for instance, be unable to deliver substitute water to the Exchange Contractors from the Sacramento River through the Delta-Mendota Canal because certain facilities necessary to do so may, at some point, be inoperative or under repair. Consistent with these foreseeable possibilities, the Friant Contract references "errors in physical operations of the Project, drought, [and] other physical causes beyond the control of the Contracting Officer," J.A. 394, which likewise could result in the government – temporarily or permanently – being unable to supply the Exchange Contractors with *any* non-San Joaquin River-sourced substitute water. Articles 4(b) and 4(c) address these specific circumstances. They do not more generally govern in all circumstances under which the government is able to provide some non-San Joaquin River water to the Exchange Contractors, but is not able to provide all of the required water from non-San Joaquin River sources.

Our conclusion is consistent with a common-sense understanding of the parties' intent in entering into the Exchange Contract. The amount of water to which the Exchange Contractors are entitled under Article 8 of the Exchange Contract is 840,000 acre-feet in non-critical years and 650,000 in critical years. This significantly exceeds the amounts to which they are entitled when Articles 4(b) and 4(c) are triggered. For instance, during a temporary interruption in the government's ability to supply any substitute water from non-San Joaquin River sources, the Exchange Contractors are entitled to the

amounts "as specified in Article 8" *only* "for the first 7 consecutive days."  J.A. 316.  Thereafter, the quantities they are entitled to are reduced to "quantities and rates as reserved in the Purchase Contract."  *Id.*

Appellants' position, then, that Article 4(b) applies whenever Reclamation is unable to deliver *the full amount* of substitute water (from non-San Joaquin River sources) to which the Exchange Contractors are entitled under Article 8, would, as the Exchange Contractors write in their brief, "convert a shortfall of even a single acre-foot into the Exchange Contractors' loss of entitlement to the remaining 649,999 acre-feet of water" in a critical year, "senselessly punish[ing] [them] for the government's inability to meet its obligations."  Intervenors' Br. at 17. Nothing in the contractual language warrants such a result, which would contradict the history and intent of the Exchange Contract: to provide the Exchange Contractors' reserved water rights in the San Joaquin River to the government to use in the CVP but *conditioned upon* the government's obligation to deliver the Exchange Contractors the specified amounts of substitute water, preferably from non-San Joaquin River sources but, if necessary, from the San Joaquin River.

Importantly, when the government acts pursuant to Article 4(b), instead of Article 8, it is relieved of other obligations as well.  In addition to being permitted to deliver lesser amounts of substitute water (after the first seven days) to the Exchange Contractors, invoking Article 4(b) also eliminates the government's responsibility to ensure the quality of substitute water (Article 9(f)), waives limits on the methods by which substitute water is to be delivered (Article 10), and changes the location where the substitute water is delivered (Article 5).  There is no indication in the Exchange Contract that the Exchange Contractors would have absolved the government of all of these duties in circumstances in which the government was still able to deliver a substantial proportion of substitute water from non-San Joaquin River water – as opposed to the narrow circumstances in which, temporarily or

permanently, the government is unable to deliver *any* water from non-San Joaquin River sources.

In short, Article 4(b) addresses specific circumstances in which the government is wholly unable to provide the Exchange Contractors with substitute water from anywhere other than the San Joaquin River.  It is undisputed that in 2014 this never occurred.  While the drought limited how much non-San Joaquin River water the government delivered to the Exchange Contractors, the government was able to – and did – deliver non-San Joaquin River water to the Exchange Contractors throughout that year; eventually, more than 300,000 acre-feet of such water.  J.A. 2114 (Appellants' expert acknowledging "there was never a day [in 2014] in which Reclamation was unable to deliver water from the Delta-Mendota Canal to the Exchange Contractors").  Accordingly, the situation here was *not* governed by Article 4(b) of the Exchange Contract.  Instead, as the government has repeatedly maintained, it acted in 2014  pursuant to its authority – and obligation – under Article 8 of that contract.  Hence, again, we agree with the Court of Federal Claims that the government was entitled to summary judgment on the Friant Contractors' breach of contract claims.

C

The Friant Contractors argue that even if we determine, as we have, that San Joaquin River water may be "substitute water," and that Article 4(a) – and, therefore, the quantities of Article 8, rather than the lower quantities of Article 4(b) – applied in 2014, as we have also concluded, the government nonetheless breached the Friant Contract due to specific features of the deliveries it made that year. We again disagree.

First, the Friant Contractors  contend that during certain months in 2014 the government "over-delivered" San Joaquin River water to the Exchange Contractors, thereby breaching the government's duty under the Friant Contract not to supply any more water to the Exchange

Contractors than was prescribed by the Exchange Contract. The Friant Contractors did not make this argument in their opening brief and, as such, it is forfeited. *See United States v. Ford Motor Co.*, 463 F.3d 1267, 1276 (Fed. Cir. 2006). ("Arguments raised for the first time in a reply brief are not properly before this court."). Even if the argument had been preserved, it lacks merit. As the Court of Federal Claims explained, the "maximum monthly entitlements" of the Exchange Contract are non-binding guidelines, so long as Reclamation does not exceed the "*annual* substitute water supply" limit of that same contract. J.A. 38-39 (emphasis added). It is undisputed that the government delivered only approximately 540,000 acre-feet of water to the Exchange Contractors over the whole of 2014. Thus, regardless of how much water the government delivered the Exchange Contractors during any particular month that year, it did not exceed the binding annual cap – so it did not deliver more water than was required under the Exchange Contract and, hence, did not breach duties owed to the Friant Contractors under the Friant Contract.

Second, the government also did not breach the Friant Contract by including among the substitute water it provided to the Exchange Contractors water it had stored in Millerton Lake. The Friant Contractors argue that "over 100,000 acre-feet of water delivered to the Exchange Contractors (largely from storage in Millerton Lake [and originating in the San Joaquin River]) . . . should have been delivered to the Friant Contractors." Reply Br. at 1. As we explained above, *see supra* III.A, including this water among what it delivered to the Exchange Contractors was entirely consistent with the Exchange Contract. To the extent the Friant Contractors are also contending that Reclamation committed a breach by storing San Joaquin River water at Millerton Lake in anticipation of needing it to supply to the Exchange Contractors, they fail to point to any specific duty in the Friant or Exchange Contract that the government violated. At most, the Friant Contractors contend that because

Article 4(b) doesn't require the use of water from Millerton Lake, the Friant Contract does not permit it.  But they fail to identify any section of the Friant Contract prohibiting the use of water from Millerton Lake.  Even if no provision of the Exchange Contract explicitly authorizes this action, neither does any provision in it (or in the Friant Contract) prohibit it.

Again, then, there was no breach of contract.

## D

Even if the Friant Contractors could, contrary to our analysis above, demonstrate that delivery of San Joaquin River-sourced water to the Exchange Contractors in 2014 was not *required* by the Exchange Contract and, therefore, such delivery constituted a breach of the government's obligations to the Friant Contractors, we would still affirm the Court of Federal Claims on the alternative grounds of the government's contractual immunity from liability.  As the Ninth Circuit has recognized, operation of the CVP assigns to Reclamation "an extremely difficult task: to operate the country's largest federal water management project in a manner so as to meet the Bureau's many obligations."  *Cent. Delta Water Agency v. Bureau of Reclamation*, 452 F.3d 1021, 1027 (9th Cir. 2006).  Unsurprisingly, then, when the government undertook these obligations it did so while also obtaining a measure of immunity from liability.

Specifically, Article 13(b) of the Friant Contract provides:

> If there is a Condition of Shortage because of . . . drought . . . or actions taken by the Contracting Officer to meet legal obligations . . . then, except as provided in subdivision (a) of Article 19 of this Contract, no liability shall accrue against the United States . . . for any damage, direct or indirect, arising therefrom.

J.A. 394.  Article 19(a), in turn, states:

> Where the terms of this Contract provide for actions to be based upon the opinion or determination of either party to this Contract, said terms shall not be construed as permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or determinations.

J.A. 402. We agree with the government that "[r]ead together, Articles 13 and 19 prevent liability from accruing against the United States during periods of drought so long as the contracting officer does not take actions that are predicated upon arbitrary, capricious, or unreasonable opinions or determinations." Gov't Br. at 13 (internal quotation marks omitted).

Taking the evidence in the light most favorable to the Friant Contractors, no reasonable factfinder could find that the Contracting Officer's actions here were of this nature. During the "critical year" of 2014, Reclamation, confronted with insufficient water from non-San Joaquin River sources to meet its full contractual obligation to supply "substitute water" to the Exchange Contractors, determined that it was required under the Exchange Contract to supply San Joaquin River water to the Exchange Contractors. The record is devoid of evidence that the government's actions were anything other than a good faith, reasonable effort to address a challenging circumstance in a manner that officials believed was compliant with the government's contractual obligations.

Accordingly, the Court of Federal Claims was right to grant summary judgment to the government on the Friant Contractors' breach of contract claim, as the government could not be found liable based on its actions, which cannot reasonably be found to be arbitrary, capricious, or unreasonable.

E

Finally, we address Appellants' takings claims.[11] Appellants allege that the 2014 actions of Reclamation constituted a taking of their property without justification, in violation of the Fifth Amendment. Here, again, we reach the same conclusion as the Court of Federal Claims, which dismissed these claims based on the lack of a protected property interest.

While the Court of Federal Claims based its dismissal decision on the Friant Parties' lack of standing, pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), J.A. 19, we have determined that the issue before us is instead whether Appellants stated a takings claim upon which relief may be granted, an inquiry governed by RCFC 12(b)(6).[12] The Friant Parties adequately alleged they were injured by Reclamation's water allocation decisions and that the Court of Federal

---

[11] The takings claim was brought by the Friant Contractors (on behalf of non-party individuals to whom they deliver water), the Friant Growers, and Fresno. J.A. 222-23 (Complaint); *see also* J.A. 15. The Court of Federal Claims dismissed as to each of these Appellants, as none had shown it had a property right to water, and the Friant Growers additionally lacked any contractual rights whatsoever. On appeal, the Friant Parties challenge only the dismissals as to the Friant Contractors (in their representative capacity) and as to the Friant Growers. Because, as a matter of law, none of the Appellants has a protected property interest in the water supplied to them by Reclamation, we need not make distinctions among them in our analysis.

[12] Appellees moved to dismiss the takings claims based on both RCFC 12(b)(1) and 12(b)(6). *See City of Fresno v. United States*, No. 16-1276C (Fed. Cl. May 15, 2019), ECF No. 136 at 3, 22-23; ECF No. 137 at 15-19, 26, 34-36; ECF No. 138 at 6-7, 9.

Claims could redress their injuries. Hence, they established standing and that the Court of Federal Claims had subject matter jurisdiction. *See Lujan v. National Wildlife Federation*, 504 U.S. 555, 560-61 (1992) ("[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.") (alterations in original; internal citations, quotation marks, and footnotes omitted). Because Appellants' allegation of a protected property interest is not "wholly insubstantial and frivolous," nor "patently without merit," they have standing and the trial court had jurisdiction to determine whether they stated a claim. *Bell v. Hood*, 327 U.S. 678, 682-83 (1946).

We turn, then, to whether Appellants stated a takings claim upon which relief may be granted. *See Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1342 (Fed. Cir. 2021) ("If we conclude that [the plaintiff's] allegations fail to state a cognizable claim, we can convert the [Court of Federal Claims'] Rule 12(b)(1) dismissal into a Rule 12(b)(6) dismissal."). They did not.

In the context of water rights, state law, not federal law, "define[s] the dimensions of the requisite property rights for purposes of establishing a cognizable taking." *Klamath Irr. Dist. v. United States*, 635 F.3d 505, 511 (Fed. Cir. 2011) (internal quotation marks omitted); *see also id.* at 512-17 (applying Oregon law). As the Supreme Court has stated on several occasions, "the [Reclamation] Act clearly provided that state water law would control in the appropriation and later distribution of the water." *Nevada*

*v. United States*, 463 U.S. 110, 122 (1983) (internal emphasis omitted); *see also California v. United States*, 438 U.S. 645, 664 (1978) (same).

Thus, we must assess whether the Friant Contractors or the Friant Growers possess property rights under California law. J.A. 199-215 (complaint alleging 18 times that Appellants have property rights "under California law"). They do not.

Appellants argue they have "appurtenant" rights to CVP water because it is delivered to their customers or to their lands. Open. Br. at 48 ("[T]he Government's allocation of water acquired for the Reclamation Act project is constrained by the appurtenant right of the landowners within that project who beneficially use the [P]roject's water to irrigate their crops."). Like the trial court, we understand their argument to be that California law gives them "appropriative" rights, i.e., a right that "'confers upon one who actually diverts and uses water the right to do so provided that water is used for reasonable and beneficial uses and is surplus to that used by riparians or earlier appropriators.'" J.A. 16 (quoting *United States v. State Water Res. Control Bd.*, 227 Cal. Rptr. 161, 168 (Cal. Ct. App. 1986)). Appellants are wrong.

First, Appellants do not have any water rights under California law because, instead, as the California State Water Resource Control Board ("SWRCB") has held, it is *Reclamation* that "has appropriative water rights in the Central Valley Project." *Cnty. of San Joaquin v. State Water Res. Control Bd.*, 63 Cal. Rptr. 2d 277, 285 n.12 (Ct. App. 1997); *see also* J.A. 2399-2403 (SWRCB Decision D-1641 (Mar. 15, 2000) ("Title to the water rights under the permits is held by [Reclamation]."), *aff'd sub nom. State Water Res. Control Bd. Cases*, 39 Cal. Rptr. 3d 189 (Cal. Ct. App. 2006)); J.A. 221 (complaint acknowledging "[t]he United States holds legal title to such water and water rights").

Second, as the government points out, "[t]he purpose of the appropriation doctrine is to reward initiative that

allows water that would have otherwise sat worthless to be put to beneficial use, thus contributing to the state's development." Gov't Br. at 56 (citing *Irwin v. Phillips*, 5 Cal. 140, 146 (Cal. 1855)). This is exactly the type of action that Reclamation undertook pursuant to the Reclamation Act, 43 U.S.C. § 372. While Appellants put the water provided to them by Reclamation to beneficial use, that supply of water would not exist without the creation and operation of the Project, i.e., the efforts of Reclamation. In this context, California law does not assign property rights in water based on the uses put to it by end users. *See Ivanhoe Irr. Dist. v. All Parties and Persons*, 350 P.2d 69, 75 (Cal. 1960) (holding that Project water "belongs to or by appropriate action may be secured by the United States" and "[i]n a very real sense it is or will become the property of the United States"), *abrogated on other grounds by California v. United States*, 438 U.S. 645, 672 (1978).

Appellants point to no California precedent persuasively supporting the proposition that the water delivered by Reclamation creates in the Friant Growers, or in the end users whose interests the Friant Contractors seek to represent, appropriative property rights. Appellants cite to a decision of the SWRCB, Cal. SWRCB Decision No. D-935. This SWRCB decision, in the course of granting permits to the United States to control certain water rights, discussed the rights of recipients of such water. J.A. 975-1086. It observed: "[u]nder our permit and license system the right to the use of water by appropriation does not vest by virtue of application, permit or license, [but] by application of the water to beneficial use upon the land." J.A. 1074. This statement does not constitute a holding that putting received Project water to "beneficial use upon the land" is sufficient to create a property right in receipt of that water. Other California authorities, including those we have already cited above, further clarify this point. *See* J.A. 2402 (SWRCB Decision D-1641) (rejecting argument that water users have property rights in Project water and stating "[the] argument that the end users of water are the water right

holders would mean that instead of having a relatively few water purveyors subject to statewide regulatory authority of the SWRCB, there would be millions of water right holders"); *Israel v. Morton*, 549 F.2d 128, 132 (9th Cir. 1977) (holding that appurtenance doctrine does not apply to water delivered by Reclamation).

Because Appellants have failed to establish that they possess any property rights in water delivery from the government, they cannot maintain a takings claim. *See Fishermen's Finest*, 59 F.4th at 1275 (explaining that only "if the court concludes that a cognizable property interest exists" do we determine whether that property interest was "taken"). Therefore, we affirm the Court of Federal Claims' dismissal of these claims.

## IV

We have considered Appellants' remaining arguments and find them unpersuasive. For the reasons stated, we affirm the judgment of the Court of Federal Claims.

## AFFIRMED

COSTS

No costs.